UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| v. | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| JOHN J. BRAVATA, RICHARD J. TRABULSY, ANTONIO BRAVATA, BBC EQUITIES, LLC AND BRAVATA FINANCIAL GROUP, LLC | ) ) ) ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| SHARI A. BRAVATA, | ) |
| | ) |
| Relief Defendant. | ) |

CIVIL ACTION NO.: 2:09-cv-12950-DML-VMM

## RESPONSE TO ORDER TO SHOW CAUSE
## ON BEHALF OF THE DEFENDANT, JOHN J. BRAVATA

### I.    *Preliminary Statement*

The Plaintiff, Securities and Exchange Commission ("Commission") filed its Motion For an Order to Show Cause [Doc. No. 63] relating to the Commission's assertions that Defendant. John J. Bravata ("Mr. Bravata") violated the Court's Asset Freeze ("Asset Freeze"). The Asset Freeze was initially obtained *ex-parte* by the Commission on July 27, 2009 at 5:17 p.m. [Doc. No. 22]. For purposes of responding to the Court's Order to Show Cause, Mr. Bravata in

*"The Securities Regulation Law Firm"*

3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com

1

summary believes that he has shown no contemptuous conduct to the Court, nor will the facts adduced at the hearing to show cause establish that: (i) Mr. Bravata disobeyed a valid Court order in the nature of the Asset Freeze; (ii) that he was able to comply with the Court's Asset Freeze; or alternatively, (iii) that Mr. Bravata should be provided with a reasonable opportunity to purge himself of any contemptuous conduct the Court may find took place. Furthermore, Mr. Bravata does not intend to deny that on August 10, 2009 he processed a loan from two of his life insurance policies issued by New York Life that resulted in his receipt of approximately a $37,000 loan.

The Asset Freeze included a notice of hearing scheduling the Commission's Motion for Preliminary Injunction for August 4, 2009 at 10:00 a.m. At the hearing, all Defendants were then represented by counsel. The "Bravata Defendants" lodged a number of objections at the hearing to the propriety of the Commission's actions in obtaining emergency, *ex-parte* relief on July 27, 2009; the Commission was NOT prepared to move forward at that time on any evidentiary hearing; and while reserving all rights to further object to the initial entry of the emergency, *ex-parte* relief sought and obtained by the Commission, the Defendants collectively consented to continue the effect of the Asset Freeze until the Court conducted an evidentiary hearing now re-scheduled for October 21-22, 2009. Although no transcript of the August 4, 2009 hearing has been obtained for purposes of the upcoming hearing, it is clear on the record from that proceeding that all rights with respect to the entry of emergency, *ex-parte* relief sought and obtained by the Commission were reserved by the Bravata Defendants.

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

2

Following the August 4, 2009 hearing, the Court entered an Order [Doc. No. 34]. The Order recites that the Commission was not prepared on that date to proceed with an injunction hearing, but after meeting and conferring, counsel for the parties did resolve some, but not all procedural issues at that time presented by this case. Notably, the Order allowed any party wishing to submit additional papers concerning requested relief from the Asset Freeze to file same on or before August 11, 2009. [Doc. No. 34, at 2]. The parties ultimately reported back to the Court that an evidentiary hearing would be necessary with respect to any further continuation of the injunctive relief contained in the emergency, *ex-parte* temporary restraining order.

No "carve outs" or relief from the Asset Freeze was agreed to by the Commission on August 4, 2009. In furtherance of the Bravata Defendants dire needs following the freezing of any assets, bank accounts, credit facilities and borrowing capabilities, the Bravata Defendants filed a series of requests for relief from the Asset Freeze [Doc. Nos. 39—filed August 9, 2009; Doc. No. 42—filed August 11, 2009; Doc. No 43—filed August 12, 2009; Doc. No. 45—filed August 13, 2009; Doc. No. 56—filed September 4, 2009 (Motion for Reconsideration).

The Commission's Motion for Order to Show Cause leads the Court to believe that the filing of the aforesaid carve out requests from the Asset Freeze were purposeful attempts to mislead the Court, nefarious in nature and reflect outright contemptuous conduct before the Court. Such is not the case. The carve out request by the Bravata Defendants filed on August 9, 2009 dealt solely with the Comerica Bank account held in the name of Dylite Adams. The carve out request by the Bravata Defendants filed on August 11, 2009 was far more general in nature due to the contention that freezing the assets of all Bravata Defendants anywhere in the world

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-0050**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

3

was far too broad; requests were made to permit several vehicles to be released from the Asset Freeze; further requests were made to allow Mr. Bravata to borrow against some or all of his life insurance policies—especially the policy he purchased in 2003, far before the formation of BBC or BFG. There is no admission made by the Bravata Defendants that the life insurance loan value that pre-dated the BBC offering timeframe was expressly understood to fall within the purview of the Asset Freeze.[1] The filing made on August 12, 2009 was a supplement to the August 11, 2009 filing, but related solely to Mr. Bravata's Declaration and certain redacted bank statements. The filing made on August 13, 2009 was a further supplement to the August 11, 2009 filing, relating primarily to the urgent need to pay a life insurance premium for Mr. Bravata's 83 year-old mother, which was due on August 15, 2009.[2]  Finally, the September 9, 2009 filing in the nature of a Motion for Reconsideration was driven by the uncertainty of whether or not the Court had considered the Declaration of Mr. Bravata filed on August 12, 2009.

Although the undersigned counsel had no knowledge of Mr. Bravata's request to process the Life Insurance Loan against New York Life Policy numbers 6 xxx 373 or 4 xxx 171, there was no surreptitious scheme to mislead the Court or counsel for that matter. Mr. Bravata's actions were driven by the information he received following the August 4, 2009 hearing relating to the Commission's clear statements that assets unconnected to the BBC offering that pre-dated

---

[1] Actually, the August 11, 2009 carve out request asserts just the contrary, where it asserts that…. "It is the position of the Bravata Defendants that life insurance cash value that existed before the commencement of offering activity by BBC is Mr. Bravata's sole and separate estate, should not be impacted by the current asset freeze and that the Court's subsequent Orders should clarify the release of these life insurance assets for use by Mr. Bravata to meet his cash needs…..(See Doc. No. 42, at 22-23).

[2] As will be shown at the hearing on the Order to Show Cause, $4,200 of the Life Insurance Loan was applied to the premium payment on this policy to avoid forfeiture.

*"The Securities Regulation Law Firm"*

3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com

4

the offering timeframe, as memorialized by the Commission's August 13, 2009 email verifying its position, were to be treated as his sole and separate property not subject to the Asset Freeze and finally, his helplessness in concurring with the position advocated by the Commission that his pre-dated life insurance policies were subject to the Asset Freeze.[3]

Orders issued by the Court are presumptively valid, unless a determination is made that an order was obtained under circumstances giving rise to improprieties, non-compliance with the Federal Rules of Civil Procedures, or otherwise deemed to have misled the Court. Based upon the Bravata Defendants' reconstruction of the events and conduct of the Commission enforcement staff commencing with the filing of the Complaint and supporting papers, through and including formal service of the Complaint on Defendants' then counsel, Butzel Long, it is likely that if the Commission had fully complied with Fed. R. Civ. Pro. 65(b)(1)(A) and (B), the Court would have deferred entry of an *ex-parte* temporary restraining order until counsel for the Defendants could be heard on the relief requested. It is also quite likely that if Butzel Long had an opportunity to be heard at that early, critical stage of this case, the Asset Freeze and other ancillary relief obtained on July 27, 2009 by the Commission would be materially different than it was and has been since inception. The Commission is fully aware of the monumental advantages in civil enforcement cases it brings which are commenced by successfully seeking emergency, *ex-parte* relief in the nature of asset freezes, appointment of receivers and expedited

---

[3] It appears undisputed that the Commission did not notify New York Life of the existence of the Asset Freeze until Mr. Hanauer emailed the relevant orders to Amy Miller at New York Life on September 4, 2009 at 1:53 p.m. (See Motion for Order to Show Cause, [Doc. No. 63, Exhibit 1]. The Commission was fully aware of the existence of all of Mr. Bravata's life insurance policies.

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

5

discovery. In partial response to the Court's Order to Show Cause, Mr. Bravata requests the Court to re-examine the Commission's conduct in securing the emergency, *ex-parte* relief—all in the context of whether the Order was validly and properly entered.[4]

### I.    Controlling Standards for Civil Contempt Proceedings

The Court has both an inherent and a statutory power to enforce compliance with its orders through the remedy of civil contempt. *See Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); *Petties v. District of Columbia,* 897 F.Supp. 626, 629 (D.D.C.1995); *SEC v. Current Fin. Servs., Inc.,* 798 F.Supp. 802, 806 (D.D.C.1992); 18 U.S.C. § 401. A civil contempt proceeding generally involves three stages: (1) the court issues an order; (2) after the party disobeys the order, the court issues a conditional order finding the recalcitrant party in contempt and threatening to impose a specified penalty unless the recalcitrant party purges itself of contempt by complying with prescribed purgation conditions; and (3) if the party does not fulfill the purgation conditions, the court exacts the threatened penalty. *See NLRB v.*

---

[4] Based upon a review of materials made available to the undersigned counsel, i.e. primarily email messages initiated by the Commission to the Court and to Butzel Long, the Commission transmitted a form of proposed *ex-parte* temporary restraining order to the Court on July 27, 2009 at 10:40 a.m. However, the Commission had only delivered the filed Complaint [Doc. No. 1] and Emergency Motion for a Temporary Restraining Order, Asset Freeze, and Other Ancillary Relief and Brief in Support [Doc. No. 4] at 9:41 a.m. on July 27, 2009 to Butzel Long. Based upon counsel's review of the available email messages initiated by the Commission, James G. Lundy, branch chief of the Commission's Chicago Regional Office represented to Mr. Donnini of Butzel Long at 9:41 a.m. on July 27, 2009 that "Jonathan and Ben will follow-up with you about the exhibits and contacting the Judge," and then, with no further communication to Mr. Donnini, submitted a form of proposed *ex-parte* order to the Court at 10:40 a.m. on July 27, 2009 with a copy of same separately sent to Mr. Donnini five minutes later. It is clear that the Commission was dealing directly with Mr. Donnini as Defendants' counsel (having thanked him for accepting service), yet wholly failed to inform the Court of Mr. Donnini's representation of the Defendants at this crucial stage of the proceeding. Why? (See Exhibit "A" and Exhibit "B" attached hereto and incorporated by reference herein). A justifiable conclusion can be made that Mr. Polish's email to the Court at 10:40 a.m. on July 27, 2009 intentionally omitted reference to Mr. Donnini acting as Defendants' counsel and having agreed to accept service.

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

6

*Blevins Popcorn Co.,* 659 F.2d 1173, 1184 (D.C.Cir.1981); *SEC v. Parkersburg Wireless, L.L.C.,* 156 F.R.D. 529 (D.D.C.1994); *Current Fin. Servs.,* 798 F.Supp. at 806.

A party is in contempt of court when he "violates a definite and specific court order requiring him to perform or refrain from performing a particular act or acts with knowledge of that order." *SEC v. Bankers Alliance Corp.,* 881 F.Supp. 673, 678 (D.D.C.1995) (quoting *Whitfield v. Pennington,* 832 F.2d 909, 913 (5th Cir.1987)). As the party seeking a finding of contempt, the SEC bears the initial burden of showing, by clear and convincing evidence, that (1) court orders were in effect, (2) the orders required certain conduct by Mr. Bravata, and (3) that Mr. Bravata failed to comply with the Court's orders. *See Bankers Alliance Corp.,* 881 F.Supp. at 678.

Once the SEC has made a prima facie showing that Mr. Bravata did not comply with the Court's orders, the burden shifts to Mr. Bravata to produce evidence justifying or excusing his noncompliance. *See Chairs v. Burgess,* 143 F.3d 1432, 1436 (11th Cir.1998). It is well recognized that a respondent to a contempt proceeding may defend against a finding of contempt on the ground that he is unable to comply with the orders. S*ee United States v. Rylander,* 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983); *SEC v. Ormont Drug & Chem. Co.,* 739 F.2d 654, 656 (D.C.Cir.1984); *Bankers Alliance Corp.,* 881 F.Supp. at 678. Unquestionalby, Mr. Bravata bears the burden of production on such a defense. *See Rylander,* 460 U.S. at 757, 103 S.Ct. 1548; *Ormont Drug & Chem. Co.,* 739 F.2d at 657 n. 7; *Bankers Alliance Corp.,* 881 F.Supp. at 683. Mr. Bravata must substantiate his inability to comply with the Court's order "categorically and in detail." *Current Fin. Servs.,* 798 F.Supp. at 808. *See also*

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4800**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

7

*Midland Bank,* 51 F.3d 5, 10 (2d Cir.1995) (stating that it is the alleged contemnor's burden to establish his inability to comply "clearly, plainly, and unmistakably."). Further, a party seeking to establish an impossibility defense to a charge of contempt should "show[ ] that he has made in 'good faith all reasonable efforts to comply." *Chairs,* 143 F.3d at 1436 (quoting *United States v. Ryan,* 402 U.S. 530, 534, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971)). *Cf. Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 713 (noting that a court may choose not to hold a party in contempt if "he has in good faith employed the utmost diligence in discharging his ... responsibilities.")

The Commission no doubt will contend that, to the extent Mr. Bravata's claimed inability to comply with the Asset Freeze has been self-created, it is not a defense to a finding of contempt. *See In re Power Recovery Sys., Inc.,* 950 F.2d 798, 803 (1st Cir.1991) (noting that a self-induced inability to comply does not establish an inability defense); *Pesaplastic, C.A. v. Cincinnati Milacron Co.,* 799 F.2d 1510, 1521 (11th Cir.1986) ("[W]here the person charged with contempt is responsible for the inability to comply, impossibility is not a defense to the contempt proceedings.") *See also Ormont Drug & Chem. Co.,* 739 F.2d at 657 (noting that the court must consider the defendant's inability to comply, but only to the extent it was without fault on the defendant's part).

A party also may defend on the ground of good faith substantial compliance with the orders, *see Food Lion, Inc. v. United Food & Commercial Workers Int'l Union,* 103 F.3d 1007, 1016 (D.C.Cir.1997); *Cobell v. Babbitt,* 37 F.Supp.2d 6, 9-10 (D.D.C.1999).

**II.    It is Unclear Whether the Order to Show Cause Contemplates Civil or Criminal Contempt Against Mr. Bravata**

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4072**
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com

As a threshold matter, Mr. Bravata is unclear on what precisely he is appearing for in terms of defending his actions, i.e. whether the Court issued the Show Cause Order contemplating civil contempt or criminal contempt proceedings. The confusion on this point emintates not from the SEC's Motion for an Order to Show Cause [Doc. No. 63], as that filing does clearly move the Court for civil contempt. The confusion arises from the Court's Order to Show Cause [Doc. No. 64], which compels Mr. Bravata to appear and show cause, "if any there be, why he should not be held in civil contempt of this Court's order freezing assets and **punished accordingly**." [Doc. No. 64, Page 1].

### *Distinguishing Between Civil and Criminal Contempt*

Contempt proceedings are classified as either civil or criminal. If the purpose of the contempt order is to **punish the contemnor** or to vindicate the authority of court, the contempt order is viewed as "criminal." If, on other hand, the purpose of the contempt order is to coerce compliance with the order or to compensate another party for contemnor's violation, the contempt order is considered to be "civil." *Matter of Terrebonne Fuel and Lube, Inc.,* 108 F.3d 609, 612 (5th Cir. 1997). The key determinant in distinguishing between criminal and civil contempt orders is whether the penalty imposed is absolute or conditional upon contemnor's conduct. *Lamar Financial Corp. v. Adams,* 918 F.2d 564, 566 (5th Cir. 1990). When the face of contempt order reflects both a punitive and coercive dimension, it is classified as a "criminal contempt" order. *F.D.I.C. v. LeGrand,* 43 F.3d 163, 168 (5th Cir. 1995). In the case before the Court, there is no "contempt order" that has been entered—only the Court's Order to Show Cause that refers to both civil contempt and punishment. In that respect the Order to Show Cause

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

9

reflects both "punitive and coercive dimensions." At this stage of the proceeding therefore, Mr. Bravata is unsure of what the nature of the proceeding to be held on October 1, 2009 is. If the proceeding is solely a civil contempt proceeding, Mr. Bravata's rights are material different than if the proceeding results in "punishment" to Mr. Bravata, notwithstanding the actual wording of the SEC's motion or the wording of the Court's Order to Show Cause.

What remedy the Commission seeks if it establishes all necessary elements of contempt is also dispositive of whether the proceeding is civil or criminal in nature, even contrary to the wording of the Commission's Motion for Order to Show Cause. If for example, the Commission was to seek to require incarceration of Mr. Bravata UNTIL compliance is had, two interesting observations and consequences arise.First, such a request does not allow the chance for Mr. Bravata to comply *prior to* incarceration (thereby murking the water as to whether the real sanction is civil or criminal in nature because said relief would be more punitive than coercive in character).Secondly,  Mr. Bravata's ability to comply is virtually nil if and while incarcerated. As an aside, if the contempt proceeding results in a criminal contempt action, the Commission would have to prove criminal intent. *U.S. v. Ortlieb,* 274 F.3d 871, 874 (5th Cir. 2001). Criminal intent, for contempt purposes, means it is sufficient if the defendant's actions in failing to comply with a decree or order were deliberate, voluntary, or intentional, as distinguished from accidental, inadvertent, or negligent. *U.S. v. Fidanian,* 465 F.2d 755, 760 (5th Cir. 1972). Suffice it to say, to the extent that the Commission may seek criminal contempt or punitive remedies against Mr. Bravata, he is not on sufficient notice, nor has the Commission made sufficient allegations or proof of  Mr. Bravata's intent to support any punitive remedies at the hearing on

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

10

the Court's Order to Show Cause.

To the extent that the Commission actually seeks civil contempt, civil contempt has two different purposes. On the one hand, it is used to enforce an order of the Court, through coerciveness, while on the other hand, civil contempt can be used to compensate a party who has suffered unnecessary injury or costs because of contemptuous conduct. *Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d 392, 400 (5th Cir. 1987). The movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence: (1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent actually failed to comply with the court's order. *Test Masters Educational Services, Inc. v. Singh,* 428 F.3d 559, 481-82 (5th Cir. 2005), *cert. denied,* 547 U.S. 1055 (U.S. 2006); *American Airlines, Inc. v. Allied Pilots Ass'n,* 228 F.3d 574, 581 (5th Cir. 2000), *cert. denied,* 531 U.S. 1191 (U.S. 2001). "Clear and convincing evidence," for purposes of contempt proceedings, is "that weight of proof which produces in the mind of the trier of fact, a firm belief or conviction as to the truth of allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to clear conviction, without hesitancy, of the truth of the precise facts of the case." *Shafer v. Army & Air Force Exchange Service,* 376 F.3d 386, 396 (5th Cir. 2004), op. clarified, 2004 WL 2107672 (5th Cir. 2004). It is also paramount to recognize that willfulness and/or intent are not elements of civil contempt, unlike criminal contempt. *American Airlines, Inc. v. Allied Pilots Ass'n,* 228 F.3d 574, 581 (5th Cir. 2000), *cert. denied,* 531 U.S. 1191 (U.S. 2001); *Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d 392, 401 (5th Cir. 1987).

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-0044**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

11

### III.    Inability to Comply with the Freeze Order is a Complete Defense to a Contempt Action.

Based upon the factual circumstances summarized below, and that will be established at the show cause hearing, Mr. Bravata was realistically unable to comply with the Asset Freeze. If a showing is made that the alleged contemnor, Mr. Bravata was then and there unable to comply with the Freeze Order, his inability to comply is a complete defense to a contempt action. *U.S. v. Rylander,* 460 U.S. 752, 757 (U.S. 1983) (citing: *Maggio v. Zeitz,* 333 U.S., at 75-76; *Oriel v. Russell,* 278 U.S. 358, 366 (1929); see also *Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d 392, 401 (5th Cir. 1987). In *Rylander,* there was an order to produce documents in an IRS proceeding, and the party required to produce claimed that it was unable to produce the documents. The United States Supreme Court recognized that a party unable to produce documents pursuant to the order defeats the motion for contempt. *Id.* The United States Supreme Court said it best:

> "While the court is bound by the enforcement order, it will not be blind to evidence that compliance is now factually impossible. Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action. It is settled, however, that in raising this defense, the defendant has a burden of production. *McPhaul v. United States,* 364 U.S. 372, 379, 81 S.Ct. 138, 142, 5 L.Ed.2d 136 (1960); *Maggio v. Zeitz,* 333 U.S., at 75-76, 68 S.Ct., at 411-412; *Oriel v. Russell,* 278 U.S., at 366, 49 S.Ct., at 175. See also *United States v. Fleischman,* 339 U.S., at 362-363, 70 S.Ct., at 746. Thus while Rylander could not attack the enforcement order on the ground that he lacked possession or control of the records at the time the order was issued, he could defend the contempt charge on the ground that he was then unable to comply because he lacked possession or control." *Id.*

Here, the focus on ability to comply with the Asset Freeze must be as of the date that the motion brought by the Commission alleges non-compliance, i.e. August 10, 2009.  There are no other allegations made of continuing or non-compliance with the Court's Asset Freeze. The

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

12

Commission's motion asserts a one-time, isolated event where Mr. Bravata requested a $37,000 loan against two of the life insurance policies maintained on his life with New York Life, his regular life insurance carrier.

Mr. Bravata secured the Life Insurance Loan at a time, and under circumstances that were extremely dire in terms of the needs of his family. The ONLY possible source of any dollars for his family's needs at that time was his ability to obtain an asset from his life insurance policies that relates so far back in time that he rightfully concluded that the loan value on the life policies had substantially accrued long before the commencement of any offering of securities by BBC—resulting in the real likelihood that the $37,000 loan value he accessed following his August 10, 2009 loan request was not and is not subject to the Court's Asset Freeze. Attached hereto and incorporated by reference as Exhibit "C" is a compendium of receipts, credit card charges, evidence of cash expenditures and obligations that Mr. Bravata applied to in using the Life Insurance Loan proceeds. It is evident that the proceeds of the loan were used for the very fabric of his family's subsistence and necessities, the relocation of his family household and maintenance of life insurance on his elderly mother.

Mr. Bravata's actions on August 10, 2009 were driven by three critical facts that he contends are not subject to dispute. Those facts are:

➢ That his family's basic needs and daily necessities were not being met and could not be met absent obtaining the Life Insurance Loan;[5]

---

[5] It is well settled that this Court has authority to freeze personal assets temporarily and the corollary authority to release frozen personal assets, or lower the amount frozen. *S.E.C. v. Unifund SAL,* 917 F.2d 98 (2d Cir.1990); *S.E.C. v. American Bd. Of Trade, Inc.,* 830 F.2d 431, 438 (2d Cir.1987), *S.E.C. v. Manor Nursing Centers, Inc.,* 458 F.2d 1082 (2d Cir.1972). While the primary purpose of freezing assets is to facilitate compensation of defrauded investors in the event a violation is established at trial, "the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations

*"The Securities Regulation Law Firm"*

3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com

13

➤ That the portion of the loan value of the oldest life insurance policies owned by Mr. Bravata that he accessed from New York Life could be withdrawn on a "FIFO" first-in-first out basis and did not impinge any accrued value of the life policies generated by premium payments during the time that BBC conducted its offering; and

➤ The admitted position stated by the Commission verbally on August 4, 2009 and in writing on August 13, 2009, to the effect that the Commission does not dispute that assets not causally connected to any BBC offering proceeds were not subject to the restrictions of the Asset Freeze. Exhibit "D" hereto represents a lengthy email received from the Commission by Mr. Bravata's counsel that was distributed to Mr. Bravata. Although the email post-dates the Life Insurance Loan—the email only verifies the Commission's position discussed with all counsel during a meet and confer session on August 4, 2009.

Although Mr. Bravata acknowledges the existence of the Court's Asset Freeze dated July 27, 2009, and as subsequently continued on August 4, 2009, the realistic impact of the Asset Freeze on he and his family went so far beyond preservation of the status quo, that the Asset Freeze was and remains to be a *de facto* "taking" of his property that pre-dated the BBC offering period without adequate due process or consideration for the deleterious effects of the Asset Freeze order as inappropriately secured by the Commission in this case on July 27, 2009. Although "two wrongs don't make a right" could be apropos with respect to the manner in which the Commission secured the Asset Freeze  and Mr. Bravata's need to obtain financing for his

---

indicating the need for such relief." *Manor Nursing Centers,* 458 F.2d at 1105. *S.E.C. v. Duclaud Gonzalez De Castilla,* 170 F.Supp.2d 427 (S.D.N.Y., 2001). It has been the contention throughout this case thus far that the deleterious effects of the freeze order as inappropriately secured by the Commission in this case on July 27, 2009 has not been sufficiently weighed against the Commission's primary purpose of requesting the *ex-parte* freeze order. For example, as will be shown at the evidentiary hearing scheduled in this case, the Commission was well aware of the fact that BBC had discontinued offering and selling any securities; that the MOFIR had issued a Cease and Desist Order months prior to the Commission filing suit in this case; and that any other activities being  conducted by the Defendants after the date of the Cease and Desist Order, were being conducted solely on the advice of and with the explicit guidance of competent securities counsel then representing BBC and BFG. There simply was no emergency on July 26-27, 2009.

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

family's needs secondarily, the fact remains that Mr. Bravata placed his family over his own

security, recognizing that he would likely be compelled to explain or show cause for his actions.

Since July 27, 2009, Mr. Bravata has had no access to any source of ready income, liquid assets

for food, utilities, school supplies and expenses for this two children, clothing, gasoline, no

ability to keep insurance on his life, home, cars or any other property current and in effect. Mr.

Bravata has had no means to maintain health care coverage for he and his family, no means to

pay for any sort of health care needed for his wife and children, nor has Mr. Bravata had any

ability to compensate his legal counsel since the inception of this case.[6] In the short time since

the Asset Freeze was entered, the Bravata family home has gone to a "Sheriff Sale," and the

family has been forced to relocate out-of-state, primarily so Mr. Bravata can begin reconstructing

his employment opportunities outside of the negative impact of weekly press accounts of the

Commission's allegations that he masterminded a $53.0 million dollar Ponzi scheme. Mr.

Bravata has lost two vehicles for non-payment and will lose two more vehicles for non-payment

shortly.  A life insurance policy purchased on Mrs. Bravata's father's life has lapsed and cannot

be reinstated, resulting in a total loss of any cash surrender or loan value in that policy.

In the face of the Commission's actions clearly designed to destroy Mr. Bravata, as well

as the remaining Defendants, by its clandestine maneuvers in obtaining a draconian, *ex-parte*

---

[6] Based upon the facts available to Mr. Bravata, it would appear that all other counsel involved in this case have been and will continue to be compensated for their representation and expertise needed by their respective clients, including the Commission's counsel. The two exceptions appear to be counsel for the Bravata Defendants and counsel for BBC and BFG—five of the six defendants accused of wrongdoing in the Commission's Complaint. Although the Bravata Defendants have requested "carve outs" from the Asset Freeze that include some basic living expenses and a reasonable sum to enable them to retain competent securities counsel, those requests have been vigorously contested by the Commission and denied by the Court. "Death by a thousand cuts is death nonetheless."

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

emergency Asset Freeze in this case, Mr. Bravata when faced with the prospect of his family's basic needs going unmet—elected to access perhaps the only remaining pre-BBC offering asset not clearly subject to the Asset Freeze and, at the same time, based his actions in part upon the Commission's own oral and written statements that his pre-offering assets would not come within the purview of the Asset Freeze since the Life Insurance Loan amount is not causally connected to the alleged unlawful BBC offering.

IV.     **The Entry of the Ex-Parte Asset Freeze Constituted an Impermissible Deprivation of Mr. Bravata's Fourth and Fourteenth Amendment Rights**

A.     **The Commission's Actions in Obtaining the Asset Freeze Order Were Violative of Mr. Bravata's Due Process Rights *Ab Initio***

In *Thomas v. Cohen*, 304 F.3d 563; 2002 U.S. App. LEXIS 17528; 2002 FED App. 0287P (6th Cir.), rehearing, en banc, denied by *Thomas v. Cohen*, 2002 U.S. App. LEXIS 25522 (6th Cir., Dec. 3, 2002), U.S. Supreme Court certiorari denied by *Cohen v. Thomas*, 538 U.S. 1032, 123 S. Ct. 2075, 155 L. Ed. 2d 1061, 2003 U.S. LEXIS 3710 (2003), the Sixth Circuit Court of Appeals made it clear that, the impact of asset freezes implicate fundamental constitutional rights.  As a general proposition, the court in *Thomas* stated:

> "The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, provides in pertinent part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. This right applies with equal force in both the civil and criminal contexts. (emphasis added) *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 539, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967). [**14]  In *United States v. Jacobsen*, 466 U.S. 109, 113, 80 L. Ed. 2d 85, 104 S. Ct. 1652 (1984), the Supreme Court explained that the first clause of the Fourth Amendment "protects two types of expectations, one involving searches, the other seizures." According to Jacobsen, a search occurs when an expectation of privacy that society is prepared to consider is infringed, whereas a seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." Id. In Jacobsen, the Court further

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

16

explained: "While the concept of a 'seizure' of property is not much discussed in our cases, this  [*570]  definition follows from our oft-repeated definition of the 'seizure' of a person within the meaning of the Fourth Amendment -- meaningful interference, however brief, with an individual's freedom of movement." Id. at 114 n 5. This expansive definition is necessary because a seizure threatens an individual's distinct interest in retaining possession of his or her property. See *Texas v. Brown*, 460 U.S. 730, 747-48, 75 L. Ed. 2d 502, 103 S. Ct. 1535 (1983) (Stevens, J., concurring)."

*Salmo v. U.S.*, 2006 U.S. Dist. LEXIS 75195 (East. Dist. Mi.—S. Div.) was a case brought in this Court which in relevant part, addressed the interplay between the effect of asset freeze orders interwoven by fundamental constitutional rights afforded to any civil or criminal litigant.  In *Salmo*, the court concurred with the over arching notion espoused in *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) where the Supreme Court wrote: "A 'seizure' of property, we have explained, occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984).)  As the Sixth Circuit noted in *Thomas v. Cohen*, 304 F.3d 563, 572 (6th Cir. 2002): "Simply put, *Soldal* does not require that the 'meaningful interference' by governmental agents actually involve the physical seizure of the property in question."  In *Salmo, id*., the interference with Mr. Salmo's possessory interest in the contents of his frozen bank accounts was surely "meaningful," since those contents were, by virtue of the asset freeze,  placed wholly beyond his reach.

The *Salmo, id*., court examined the impact of an asset freeze arising in the context of an *ex-parte* order entered in *Colello v. S.E.C.*, 908 F. Supp. 738, 753 (C. D. Cal. 1995), where a Swiss asset freeze initiated in aid of an SEC civil enforcement action was deemed to be a Fourth

*"The Securities Regulation Law Firm"*

3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com

17

Amendment Seizure, citing *Soldal, supra*).[7] The *Colello* case, although involving the court's interpretation of an international treaty between the United States and Switzerland, is factually analogous to the proceedings that have occurred to date in this case. In *Colello*, the Commission filed its complaint for a temporary restraining order, preliminary and permanent injunctions, appointment of a receiver, and other equitable and legal relief against several defendants, including name defendant, Michael J. Colello.

That same day, the Commission applied *ex parte* for a "Temporary Restraining Order, Temporary Orders: (1) Prohibiting the Transfer of Assets and Destruction of Documents; (2) Freezing Assets; (3) Appointing a Receiver; and (4) For an Accounting, Order to Show Cause Why a Preliminary Injunction Should Not be Granted and the Temporary Orders Should Not Be Continued, and Request for Waiver of Notice Pursuant to Local Rule 7.18.2." The Commission submitted three volumes of exhibits supporting its applications for *ex-parte* relief.

Judge Hatter, the District Judge assigned to the case, entered an order granting the SEC's *Ex Parte* TRO Application on June 23, 1994, appointing a temporary receiver. The court granted a preliminary injunction with respect to two of the defendants that same date. A preliminary injunction hearing was set for July 5, 1994.

---

[7] See *Soldal v. Cook County*, 506 U.S. 56, 69 (1992) (holding that the Fourth Amendment's standard of "reasonableness" applies to any seizure by the government in any context); cf. *Colello v. SEC*, 908 F. Supp. 738, 752-55 (C.D. Cal. 1995) (ruling that an asset freeze by Swiss authorities at the request of the Department of Justice and the SEC violated the Fourth Amendment in that a treaty allowed seizure based on reasonable suspicion rather than probable cause), aff'd, 139 F.3d 674 (9th Cir. 1998); *OKC Corp. v. Williams*, 461 F. Supp. 540, 551 (N.D. Tex. 1978) (stating that if the SEC "knew or should have known at the time of the seizure's occurrence" that the informant was conducting a private party search, then the SEC violated Fourth Amendment rights).

*"The Securities Regulation Law Firm"*

3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com

The court in *Colello* ultimately ruled that the defendants in the case brought by the Commission had their Fifth Amendment rights to due process and their Fourth Amendment right to be protected from unreasonable seizures, violated by the asset freeze of their Swiss assets.[8]

In a line of Due Process cases, the U.S. Supreme Court has employed a similar test for whether property is "seized." In *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601 (1975), the Court sustained a Due Process challenge to a Georgia garnishment statute under which the debtor's "sizable bank account was frozen" pursuant to the challenged writ. *Id.*, at 607. The result, the court noted, was that "[u]pon service of the writ, the debtor is deprived of the use of the property in the hands of the garnishee." Relying on its earlier decision in *Fuentes v. Shevin,* 407 U.S. 67 (1972), the court held that the debtor's Due Process rights were violated by the procedure, and the court's discussion of that case, and its impact on the issue there, make it perfectly clear that it considered this kind of temporary sequestration a "seizure" for Due Process purposes:

> "There the Court held invalid the Florida and Pennsylvania replevin statutes which permitted a secured installment seller to repossess the goods sold, without notice or hearing and without judicial order or supervision, but with the help of the sheriff operating under a writ issued by the clerk of the court at the behest of the seller. That the debtor was deprived of only the use and possession of the property, and perhaps only temporarily, did not put the seizure beyond scrutiny under the Due Process Clause. "The Fourteenth Amendment draws no bright lines around three-day, 10-day, or 50-day

---

[8] *Colello* and the other plaintiffs in the case argued that the Swiss asset freeze obtained by the Commission through a cooperative effort by the U.S. Department of Justice, constituted a "seizure" within the meaning of the Fourth Amendment, and that the Government's failure to obtain a warrant renders the asset freeze "per se unreasonable." <u>Both the Commission and Justice agreed that the asset freeze was in fact a "seizure."</u> The Government argued, however, that the seizure was reasonable and therefore not a violation of the Fourth Amendment.

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4080**
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com

deprivations of property. Any significant taking of property by the State is within the purview of the Due Process Clause." *Id.*, at 86, 92 S.Ct., at 1997.

Thus, from either a Fourth Amendment or Due Process perspective, the "freezing" of Mr. Bravata's assets must be considered a "seizure" and therefore subject to the strictures of the Fourth and Fourteenth Amendments. For the reasons previously set forth, the Commission's failure to comply with those strictures requires careful scrutiny by this Court, including the scrutiny given at this stage of the proceeding wherein the Commission seeks to hold Mr. Bravata in contempt of this Court's Asset Freeze.

### B. The Commission's Actions in Obtaining the Asset Freeze Violated Fed. R. Civ. Pro. 65(b)(1)(B) and Michigan Rules of Professional Conduct 3.3(d)

In the process of obtaining emergency, *ex-party* orders that constitute a "seizure" of a person's property, unreasonably maintaining the propriety of the seizure while at the same time badgering third-party witnesses in hopes of obtaining sworn affidavits or declarations to support the Commission's allegations of unlawful conduct on a *post-hoc* basis, the Commission now seeks to punish Mr. Bravata for his conduct asserted to have violated the Asset Freeze. The validity of the initial entry of the Asset Freeze, the broad scope of the Asset Freeze and the Commission's relentless efforts to bring Mr. Bravata to his financial knees—is occurring during a time when the Commission refuses to acknowledge that its investigation conducted prior to instituting suite in this case resulted in its <u>actual awareness</u> that: (i) the Defendants expressly disclosed in writing to BBC investors all material facts with respect to BBC such that the alleged "Ponzi" scheme could not be actionable as alleged in the Commission's Complaint; (ii) that BBC at all relevant times followed the professional, legal securities advice and guidance of more than

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

20

one recognized securities counsel in the conduct of the BBC offering; and (iii) the Commission had actual knowledge that BBC was NOT conducting further offerings of its securities since the date of entry of the MOFIR Cease and Desist Order (March 30, 2009). Yet, in the face of this information; having worked "hand-in-glove" with BBC's outside counsel, Butzel Long, for months prior to filing its Complaint; and notwithstanding Butzel Long's repeated requests to meet with the enforcement staff of the Commission assigned to the BBC inquiry, the Commission managed to create an emergency at the time its Complaint was filed and managed to secure dubious *ex-parte* relief in this case. Even more questionable is the undisputed fact that the Commission conducted substantive meetings on May 14, 2009 with lawyers from Butzel Long, in Chicago, Illinois (at Butzel Long's request) for the purpose of understanding precisely what proactive or remedial measures were being undertaken by the Defendants in light of the MOFIR and Commission inquiries and to make sure the Commission understood that BBC was instituting curative measures with respect to the Commission's concerns.

At the May 14, 2009 meeting with the Commission, Butzel Long reviewed a comprehensive 60-page power point presentation with the Commission enforcement staff outlining these measures and representing to the enforcement staff the cessation of BBC's offering programs. Attached hereto as Exhibit "E" is a redacted copy of the May 14, 2009 presentation, which surely evidences that there in deed was no emergency or need for the Commission to represent in its July 26, 2009 filing that irreparable loss or damage would occur in the event that emergency, *ex-parte* relief was not entered as suggested by the Commission. These material defects in the Commission's actions should be seriously examined and

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-0742**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

21

scrutinized by this Court in the context of Mr. Bravata's response to the Court's Order to Show Cause and certainly, at a minimum, at the coming evidentiary hearing in this case.[9] Following the May 14, 2009 meeting with the Commission enforcement staff, Butzel Long provided additional substantive responses to the Commission's follow up questions in the form of a detailed 13-page letter dated May 29, 2009 (FOIA Confidential Treatment of this letter was requested).

It can hardly be disputed that the Commission enforcement staff violated two key procedural requirements at the time that it requested and obtained the Asset Freeze it now seeks to punish Mr. Bravata for violating. First, the Commission did not comply with Fed. R. Civ. Pro. 65(b)(1)(B) and on that basis alone, the Asset Freeze was improvidently entered. Secondly, and no less relevant, the Commission enforcement staff failed to comply in any respect with Michigan Rules of Professional Conduct 3.3(d). Neither of these two requirements are "mere technicalities." Both of these requirements are in place to offer some level of Due Process protection to defendants in civil actions that do not even yet know they are defendants; nor yet do they have any awareness that ALL of their assets and many of their rights as U.S. citizens are about to be frozen in time and taken away merely on the basis of the Commission's allegations— none of which have yet been tested by the adversarial process.

---

[9] The Commission makes it clear that it does not wish to have its investigation or its investigators scrutinized. A Motion for Protective Order to Preclude Bravata Defendants from Calling Plaintiff's Trial Counsel as Witness at Preliminary Injunctive Hearing and For Other Relief was filed by the Commission on September 15, 2009 [Doc. No. 65] seeking two forms of specific relief. First, the Commission does not want to permit the Bravata Defendants to question one of its enforcement staff on the facts giving rise to the entry of the emergency, *ex-parte* relief granted in this case; nor does the Commission want to permit the Bravata Defendants to be able to present several affirmative defenses outlined in their Answer and Affirmative Defenses [Doc 52].

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

22

### (i)    Non-compliance with Fed. R. Civ. Pro. 65(b)(1)(B)

The Rule authorizes the issuance of a temporary restraining order ("TRO") without notice to the adverse party in certain limited circumstances. An *ex parte* TRO may only be granted under Rule 65(b)(1) if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; **and**

> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

The Commission's Complaint [Doc. No. 1] is not verified, nor are the allegations in the Complaint supported by separate affidavit. The Commission's Motion for Emergency Motion for a Temporary Restraining Order, Asset Freeze, and Other Ancillary Relief and Brief in Support [Doc. No. 4] ("Motion for TRO") filed on July 26, 2009 is not verified. The only document filed by the Commission on July 26-27, 2009 in support of its Motion for TRO is the Declaration of Luz Aguilar [Doc. No. 9], attached to the Commission's Motion for TRO as Exhibit "A." There is no other form of compliance by the Commission with Rule 65(b)(1)(A) or (B). In fact, the Commission admits that there has been no compliance with Rule 65(b)(1)(B). To the best of Mr. Bravata's knowledge, the Commission did not reveal or indicate to the Court prior to the entry of the TRO at 5:17 p.m., July 27, 2009 that any of the Defendants were represented by counsel even though the Commission's enforcement staff had actual knowledge of such for several months. Under this circumstance alone, compliance with Rule 65(b)(1)(B) is even more relevant so the Court could have been aware of the existence of Defendants' counsel at a very critical stage of the proceedings commenced the day before on Sunday, July 26, 2009.

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

23

In *United States v. Mercy Reg'l Health Sys.*, 2008 U.S. Dist. LEXIS 18520 (S.D. Ill., Mar. 11, 2008), without reaching the Government's arguments as to whether an *ex-parte* TRO should be granted under Rule 65(b)(1)(A), the court noted that the movant's attorney had not certified in writing any efforts made to give notice or reasons why notice to the opposing party should not be required as is necessary under Rule 65(b)(1)(B). The court denied the Government's request for an *ex parte* TRO, commenting that if and when the Rule 65(b)(1)(B) certification is filed, the court would consider the supplemental filing as a motion to reconsider.

Similarly, in *Conroy v. Avalos, et al.*, 2008 U.S. Dist. LEXIS 25277 the court ruled that "Petitioner has not certified "in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(B). Because the Motion for Temporary Restraining Order fails to comply with Rule 65(b)(1)(B), the Court, in its discretion, will deny the Motion." See *American Can Co. v. Mansukhani*, 742 F.2d 314, 321 (7th Cir. 1984) (district court abused its discretion in granting *ex parte* temporary restraining order "when there was no valid reason for proceeding *ex parte* and by disregarding the strict procedural requirements of Fed. R. Civ. P. 65(b) for the issuance of such *ex parte* orders"); see also *Adobe Systems, Inc. v. South Sun Products, Inc.*, 187 F.R.D. 636 (S.D. Cal. 1999).

Not only did the Commission fail to comply with Rule 65(b)(1)(B), the Declaration of Luz Aguilar, an accountant with the Commission since 1991, is facially defective and fails to comply with the requirements for affidavits generally accepted by Federal courts under the Federal Rules of Civil Procedure, specifically Rule 56(e), which outlines the form and content of

*"The Securities Regulation Law Firm"*

3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com

24

sworn affidavits or declarations in support or opposition to motions for summary judgment.[10] In fact, the evidentiary standards for consideration of affidavits or declarations in an *ex-parte* proceeding should be held to a more exacting standard of admissibility compared to the adversarial environment of affidavits filed in support or opposition to motions for summary judgment. The Declaration of Luz Aguilar states nothing more than "Based upon my review of the information discussed in paragraph 3 above, I am informed and believe and, therefore, state the information set forth below" [Doc No. 9, ¶ 6]. Almost without exception, the following 78 paragraphs of the Declaration of Luz Aguilar establish nothing more than the declarant's review of a specific document and then the declarant asserts a statement of fact SHE believes to be true under penalty of perjury. The problem is that the only statement of fact contained in the paragraphs of the Declaration are that a given document was reviewed. The remainder of each paragraph of the Declaration recites Ms. Aguilar's conclusion or interpretation of what the document she reviewed means, at least to her. None of these purported factual statements have been subject to cross-examination or scrutiny at any point in this proceeding. Instead, the

---

[10]    Under Fed.R.Civ.P. 56(e), an affidavit submitted in support of or in opposition to a motion for summary judgment "shall set forth such facts as would be admissible in evidence." It is therefore well-established that a "hearsay affidavit is a nullity on a motion for summary judgment." *Schwimmer v. Sony Corp. Of Am.,* 637 F.2d 41, 45 & n. 9 (2d Cir.1980); *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 131 & n. 12 (2d Cir.2004) (district court deciding summary judgment motion was required to disregard hearsay in affidavits because it would be inadmissible at trial). *Dora Homes, Inc. v. Epperson*, 344 F.Supp.2d 875 (E.D.N.Y., 2004) Under Rule 56(e), supporting affidavits must "set forth facts as would be admissible in evidence," language that has been interpreted by the Sixth Circuit to require that hearsay evidence in affidavits must be stricken. *Wiley v. U.S.,* 20 F.3d 222, 226 (6th Cir.1994) ("[H]earsay evidence cannot be considered on a motion for summary judgment.") Hearsay is an out of court statement offered for the truth of the matter asserted. Fed.R.Evid. 801(c). An out of court statement offered to serve some other purpose is not hearsay and may be considered by the trier of fact. *See Browne v. Signal Mountain Nursery, L.P.,* 286 F.Supp.2d 904, 924 (E.D.Tenn. 2003).

*"The Securities Regulation Law Firm"*

3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com

25

Commission uses the Declaration of Luz Aguilar as its apparent compliance with Rule 65(b)(1)(A).

Focusing on only two of the 84 paragraphs of the Declaration of Luz Aguilar establishes the harm in the Commission's presentment of the Declaration as its compliance with Rule 65(b)(1)(A). Paragraph 16 of the Declaration recites that Ms. Aguilar received and reviewed BBC's private placement memoranda dated February 6, 2007 and April 17, 2008 and that each of those documents is attached to the Declaration as Exhibits (A)16 and (A)17. Nowhere in the Commission's Complaint, or its Motion for TRO or any papers offered in support of the Motion for TRO does the Commission or Ms. Aguilar notate that BBC vividly, and on multiple occasions, disclosed in the private placement memoranda that BBC reserved the right to apply proceeds of the offering of BBC membership units to pay distributions due to other investors that purchased BBC membership units. Since the first sentence of the Commission's Complaint and its Motion for TRO boldly asserts that "Plaintiff, the U.S. Securities and Exchange Commission ("SEC"), respectfully files this emergency motion to shut down an ongoing offering fraud and Ponzi scheme involving $50 million and at least 440 investors," it would seem that the Commission could have at least in passing pointed out to the Court that BBC's private placement memoranda attached as Exhibits (A)16 and (A)17 to the Commission's Motion for TRO (approximately 100 pages of nearly 1,000 pages of exhibits), made numerous disclosures to BBC investors of a variety of material facts negating the prospect that the Defendants were masterminds of a Ponzi scheme. For further emphasis, attached hereto as Exhibit "F" are select pages taken from both private placement memoranda attached to the Commission's Motion for

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

26

TRO as Exhibit A(16) and A(17). These pages vividly disclose how and under what circumstances BBC was able to use the proceeds of the BBC offerings—including the payment of distributions and/or redemptions to earlier investors in the event that sufficient revenue had not yet been generated by BBC in the early stages of its real estate portfolio. Knowing that these material disclosures were buried hundreds of pages deep in thousands of pages of exhibits filed in support of its request for *ex-parte* relief, the Commission still splashed and sprinkled throughout its Complaint and Motion for TRO that the Defendants masterminded a $50.0 million Ponzi scheme. For this reason alone, the Asset Freeze was entered based upon a lack of material disclosures to the Court by the Commission.

The Commission asserts in one single paragraph of its Complaint [Doc. No. 1, ¶ 55], that emergency, *ex-parte* relief is necessary based on the Commission's belief that Defendants contemplate an offering of securities by an affiliated company, Phoenix Venture Capital, LLC ("Phoenix"). The Commission's Motion for TRO [Doc. No. 4 at 11-12] also mentions Phoenix in passing, but there are no allegations that Phoenix or Defendants' actions with regard to Phoenix is any anyway violative of any Federal securities laws. At most, the Commission asserts in unsupported fashion that Messrs. Trabulsy and Bravata "hatched a scheme." Perhaps in line with the entire history of this case, Butzel Long provided the Commission enforcement staff with all offering documents associated with Phoenix, which fully discloses the State of Michigan and Commission inquiries involving the Defendants. Moreover, these offering materials were developed with the advice and guidance of Butzel Long and on their face appear to be fully compliant with offering exemptions afforded by Rule 506 of Regulation D promulgated under

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

27

the Securities Act of 1933. This is the contrived basis for the Commission's emergency, but allegations of wrongdoing or securities law violations by Phoenix are conspicuously absent from the Commission's emergency, *ex-parte* papers. Even the Declaration of Luz Aguilar refers to Phoenix only in passing and includes nothing but speculation on the part of the declarant as it relates to Phoenix (See Declaration of Luz Aguilar, ¶¶ 76-77). Even though Ms. Aguilar declares that she reviewed the Phoenix documentation, she fails to attach copies of the offering materials developed by Phoenix with the guidance of Butzel Long—ostensibly due to the fact that the offering materials are well prepared, on their face include all material representations ordinarily and customarily given to prospective accredited investors in a Regulation D, Rule 506 offering and is further indicia of the Commission's unwillingness to provide exculpatory materials to the Court during its solicitation of emergency, *ex-parte* relief.[11]

### (ii)    Non-compliance with MRPC 3.3(d)[12]

To compound the Commission's non-compliance with explicit procedural rules contained in Rule 65(b)(1)(A) and (B), the Commission had no regard for the requirements of Michigan Rule of Professional Conduct, 3.3(d), which is fairly clear.

---

[11] So the Court can examine the Phoenix offering materials claimed by the Commission to give rise to the emergency of July 26-27, 2009, a complete copy of the Private Placement Memorandum (without attachments) is attached hereto as Exhibit "G."

[12] The Commission's Enforcement Manual (October 6, 2008) provides that: Attorney Responsibility (under the OGE Standards of Ethical Conduct for Employees of the Executive Branch, the Rules of Professional Responsibility of the state in which the attorney is licensed to practice law, and the Rules of Professional Responsibility of the state in which the attorney is appearing on behalf of the Commission before a tribunal or otherwise engaging in such other behavior as may be considered the practice of law under that state bar's ethical and disciplinary rules. (See § 1.4.4 of Enforcement Manual). Local Rule 83.20 also mandates that all attorneys practicing before this Court consent to be bound by the Rules of Professional Conduct adopted by the Michigan Supreme Court.

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**

28

**Rule 3.3 Candor Toward the Tribunal.**

(d) In an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts that are known to the lawyer and that will enable the tribunal to make an informed decision, whether or not the facts are adverse.

The Comment following Rule 3.3(d) is even more clear:

***Ex Parte* Proceedings**

Ordinarily, an advocate has the limited responsibility of presenting one side of the matter that a tribunal should consider in reaching a decision; the conflicting position is expected to be presented by the opposing party. However, in an ex parte proceeding, such as an application for a temporary restraining order, there is no balance of presentation by opposing advocates. The object of an ex parte proceeding is nevertheless to yield a substantially just result. The judge has an affirmative responsibility to accord the absent party just consideration. The lawyer for the represented party has the correlative duty to make disclosures of material facts that are known to the lawyer and that the lawyer reasonably believes are necessary to an informed decision.

*Shah v. City of Farmington Hills* , 2005 Mich. App. LEXIS 1024 (Mich. Ct. App. Apr. 26, 2005)—reversed on appeal on other grounds at 278 Mich. App. 95, 748 N.W.2d 592, 2008 Mich. App. LEXIS 380 (2008) addressed the application of Rule 3.3(d) in the setting of obtaining *ex-parte* relief. Relying upon *Matley v Matley (On Remand)*, 242 Mich. App. 100, 101; 617 N.W.2d 718 (2000) in the context of whether or not a court can be misled by counsel failing to disclose certain material information in an adversary proceeding where both parties are represented by counsel, the court agreed that in an *ex-parte* proceedings, the professional responsibility of one party's counsel is far different. In both *Matley* and *Shah, supra*, the Michigan Court of Appeals intimated rather strongly that:

"We find . . . support for this conclusion in the Michigan Rules of Professional Conduct. Michigan Rule of Professional Conduct 3.3(d) provides that "[*i*]*n an ex parte proceeding*, a lawyer shall inform the tribunal of *all* material facts that are known to the lawyer and that will enable the tribunal to make an informed decision, *whether or not the facts are*

*"The Securities Regulation Law Firm"*

3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4060
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com

29

*adverse.*" (Emphasis added.) The comment following MRPC 3.3 addresses the difference between an advocate's duty during an ex parte proceeding and during an adversary proceeding, explaining that an advocate normally "has the limited responsibility of presenting one side of the matters that a tribunal should consider in reaching a decision; the conflicting position is expected to be presented by the opposing party." It is only during an ex parte proceeding that the lawyer for the represented party has a duty "to make disclosures of material facts that are known to the lawyer and that the lawyer reasonably believes are necessary to an informed decision." See Comment following MRPC 3.3. If an advocate generally has the responsibility to present only one side of the matters at issue, then a party cannot commit fraud on the court by failing to disclose to the court facts that are adverse to his position where the facts are known by the opposing party."

### V. Conclusory Remarks

This case is just short of being eight weeks old and has consumed much of the Court's time thus far. Mr. Bravata's actions in obtaining the Life Insurance Loan were not purposely or cavalierly intended to be contemptuous of the Court's Asset Freeze. Faced with no choices or no "good choices," Mr. Bravata followed his best judgment by reaching back for his only liquid asset that he believed in good faith should be deemed to be outside of the scope of the Asset Freeze for the reasons enunciated above. Aside from explaining Mr. Bravata's actions in obtaining the Life Insurance Loan, we also believe that the manner in which the Commission obtained the Asset Freeze initially was fundamentally unfair and violative of the Defendants' Due Process and procedural rights in this case. This conclusion, should the Court concur, should be a factor to be taken into consideration in adjudicating the Commission's Motion for Order to Show Cause.

Dated this 24th day of September, 2009.

Respectfully Submitted,

*"The Securities Regulation Law Firm"*

3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com

By: /s/ Gregory Bartko, Esq.
**Law Office of Gregory Bartko, LLC**
Gregory Bartko, Esq.
Michigan Bar No. P30052
*Counsel for Bravata Defendants*
3475 Lenox Road, Suite 400
Atlanta, GA 30326
Telephone: (404) 238-0550
Facsimile: (866) 342-4092
gbartko@securitieslawcounsel.com

*"The Securities Regulation Law Firm"*

3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com

31

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

|  |  |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | ) |
| | ) |
| **v.** | ) |
| **Plaintiff,** | ) |
| | ) |
| **JOHN J. BRAVATA, RICHARD J. TRABULSY, ANTONIO BRAVATA, BBC EQUITIES, LLC AND BRAVATA FINANCIAL GROUP, LLC** | ) **CIVIL ACTION NO.: 2:09-cv-12950-DML-VMM** |
| | ) |
| **Defendants,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **SHARI A. BRAVATA,** | ) |
| | ) |
| **Relief Defendant.** | ) |
| | ) |

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing RESPONSE TO

ORDER TO SHOW CAUSE ON BEHALF OF THE DEFENDANT, JOHN J. BRAVATA

was filed electronically this 24th day of September, 2009 with the Clerk of the Court using

*CM/ECF.* I also certify that the foregoing document is being served this day on all counsel of

*"The Securities Regulation Law Firm"*

3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092
Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com

record and any *pro se* parties identified on the attached Service List via e-mail and U.S. mail, either via transmission of Notices of Electronic Filing generated by *CM/ECF* or via U.S. mail to those parties that have formally appeared of record but are who are not authorized to receive electronic Notices of Electronic Filing.

Respectfully Submitted,


By: /s/ Gregory Bartko, Esq.
Law Office of Gregory Bartko, LLC
Gregory Bartko, Esq.
*Counsel for Bravata Defendants*
3475 Lenox Road, Suite 400
Atlanta, GA 30326
Telephone: (404) 238-0550

*"The Securities Regulation Law Firm"*

**3475 Lenox Road, Suite 400 ● Atlanta, GA 30326 ● Phone (404) 238-0550 ● Fax (866) 342-4092**
**Email: gbartko@securitieslawcounsel.com ● www.securitieslawcounsel.com**