UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                                               Case Number 09-12950
        Plaintiff,                              Honorable David M. Lawson

v.

JOHN J. BRAVATA, RICHARD J.
TRABULSY, ANTONIO M. BRAVATA,
BBC EQUITIES, LLC, BRAVATA
FINANCIAL GROUP, LLC, and SHARI A.
BRAVATA,

        Defendants.
_____/

**<u>OPINION AND ORDER GRANTING PLAINTIFF'S</u>**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

This matter is before the Court on the motion by plaintiff United States Securities and

Exchange Commission (SEC) for summary judgment. The SEC filed an amended complaint

alleging that defendants John J. Bravata, Richard J. Trabulsy, Antonio M. Bravata, BBC Equities,

LLC, and Bravata Financial Group, LLC unlawfully sold unregistered securities (Count I), violated

the Securities Act by defrauding investors (Counts II and III), violated the Securities Exchange Act

by engaging in a scheme to defraud investors (Count IV), and unlawfully sold securities without

registering under the Securities Exchange Act as broker dealers (Count V). The SEC seeks

damages, fines, disgorgement, and injunctive relief against those defendants, and disgorgement from

"relief defendant" Shari A. Bravata because she enjoyed the proceeds of the fraudulent scheme.

Shortly after the complaint was filed in the summer of 2009, the Court entered a preliminary

injunction that froze the defendants' assets, and, after holding an evidentiary hearing, continued the

injunction, which has remained in effect throughout this lawsuit.

While this case was pending, the government indicted defendants John Bravata, Richard Trabulsy, and Antonio Bravata for various counts of conspiracy and wire fraud stemming from the conduct alleged in the amended complaint in this case. Trabulsy pleaded guilty and a jury convicted John and Antonio Bravata. The SEC argues in its motion that under the doctrine of collateral estoppel, the fraud elements of its claims are established conclusively, there are no material fact disputes on the other elements, and therefore it is entitled to a judgment as a matter of law. John Bravata, Antonio Bravata, and Shari Bravata have filed responses opposing the motion. The Court has reviewed the parties' submissions and finds that the relevant law and facts have been set forth in the motion papers and that oral argument will not aid in the disposition of the motions. Moreover, John and Antonio Bravata are in prison and not able to attend a hearing, so an oral presentation by the plaintiff would be one-sided and not serve a useful purpose. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *See* E.D. Mich. LR 7.1(f)(2).

There is no doubt that the criminal convictions are conclusive as to the elements necessary to establish the crimes of wire and mail fraud and conspiracy to commit wire and mail fraud. The fraudulent scheme alleged in the superseding indictment dealt with the BBC securities offerings. The defendants' responses to the motions attempt to relitigate the defenses in the criminal case rejected by the jury and the trial judge when he denied the motion for judgment of acquittal. And their arguments are conclusory and contain no references to the record in this case, except for sections of the private placement memorandum (PPM), which does not withstand the force of the criminal convictions. The Court finds that there are no issues of material fact that warrant a trial, and the plaintiff is entitled to a judgment as a matter of law on the defendants' liability. "Relief defendant" Shari Bravata argues that she is entitled to a jury trial to adjudicate the disgorgement

-2-

claim, but because that is an equitable remedy, the Court, not a jury, must decide it.  The undisputed

facts show that the SEC is entitled to the relief it seeks, and therefore the Court will enter judgment

against the defendants as outlined below.

## I.   Facts and proceedings

Defendant John Bravata formed Bravata Financial Group in January 2003.  He started BBC

Equities on May 1, 2006.  Between 2006 and June 30, 2009, these defendants received $55.2 million

from approximately 440 investors.  The SEC alleges, and the evidence establishes, that the

defendants engaged in the unauthorized sale of securities to generate those funds, and that the

securities it offered for sale were part of a fraudulent scheme in which earlier investors were paid

"returns" from new investments remitted by subsequent investors.  That type of investment structure

is commonly known as a pyramid or Ponzi scheme.

The Michigan Office of Financial and Insurance Regulation issued a cease and desist order

against BBC in March 2009, and, as mentioned above, this Court issued a preliminary injunction

that froze BBC's operations and assets in July 2009.  The Court held an evidentiary hearing over

several days before ordering the injunction continued.   The facts discussed below include

consideration of the testimony taken at the preliminary injunction hearing only insofar as (1) any

statements made by a party witness may be taken as party admissions, and the party points to no

other specific contradictory facts in the record, *see* Fed. R. Evid. 801(d)(2)(a); and (2) other

uncontested facts were established at that hearing, *see* Fed. R. Civ. P. 65(a)(2) (stating that

"evidence that is received on [a] motion [for preliminary injunction] and that would be admissible

at trial becomes part of the trial record and need not be repeated at trial").  *See also Cintas Corp. v.*

*Perry*, 517 F.3d 459, 466 n.2 (7th Cir. 2008) (holding that where discovery did not produce much

additional evidence, "[t]he district court correctly articulated the summary judgment standard and did not err in referring to findings from the preliminary injunction phase of the lawsuit"); *Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987) (holding that a transcript of preliminary injunction hearing could be considered on a motion for summary judgment, although the party offering testimony bore the burden of producing it); *Century 21 Real Estate LLC v. All Professional Realty, Inc.*, 889 F. Supp. 2d 1198 (E.D. Cal. 2012) (holding that in deciding a motion for summary judgment the court could consider the substance of the testimony from the transcript of a prior evidentiary hearing on a motion for preliminary injunction without taking judicial notice of the transcript).

## A.  Background facts

Defendants John Bravata and Richard Trabulsy operated BBC Equities, LLC and Bravata Financial Group, LLC.  BBC Equities and Bravata Financial solicited contributions from individuals, representing that the funds would be invested and specific returns would be realized.  As mentioned above, approximately 440 individual investors transferred to BBC Equities and Bravata Financial funds totaling $52,943,630.  None of the defendants was a registered securities broker or dealer at the time.

The records of the corporate defendants reveal that the returns paid out to (or reinvested for) earlier investors came not from proceeds earned by the companies' investments, but rather from funds contributed by later investors.  The records also show that the investors' money was used by the individual defendants to purchase several personal luxury items.

### 1. Inception date

There is a dispute over the date the investment scheme began. The SEC contends that BBC began taking money from investors on May 22, 2006. The defendants argue that no investment in BBC Equities occurred until October 2006. The company records show that the transfers of funds by Roman Kuzma and Lily Trabulsy (Richard Trabulsy's grandmother) into the personal bank accounts of John and Shari Bravata and the account of Bravata Financial represent the initial investments in BBC Equities. BBC Equities's promotional materials represent that the "inception date" of the BBC Equities offering was May 1, 2006. As noted above, John Bravata founded BBC Equities on that same date, although at the time BBC Equities was known as Bravata Holdings X, LLC. On May 19, 2006, John and Shari Bravata's primary bank account had a balance of $198.18. On May 22, 2006, Roman Kuzma wired $100,000 to the Bravatas' primary bank account, and he wired an additional $299,985 to the Bravatas' bank account on June 9, 2006. On June 8, 2006, Bravata Financial's bank account had a balance of $9,440.27. The next day, Lily Trabulsy paid $210,000, which was deposited into Bravata Financial's bank account. After receiving Lily Trabulsy's $210,000 deposit, Bravata Financial transferred $120,000 to John Bravata's primary checking account and issued Richard Trabulsy a $45,000 check with the notation "commissions."

John Bravata argues that investor Kuzma did not subscribe to the units offered and sold by BBC Equities in June 2006. Kuzma states that he entered into a partnership with John Bravata to purchase two distressed commercial properties in Brighton and Ferndale, Michigan for potential resale, and he loaned Bravata funds to establish a financial services business. However, Kuzma testified that he could not remember the specific dates of interactions with Bravata in the 2005-2007 time frame, and that he gave Bravata money during that period to invest in real estate. In a settlement agreement that Kuzma entered with Bravata and BBC Equities in August 2008, Kuzma

asserted that he was entitled to receive 3,000,000 Class A shares of BBC Equities securities as a result of Kuzma's advancing Bravata $890,000 for "real estate interests." Kuzma, Bravata, and BBC Equities agreed that "the funds [Kuzma] advanced were on account of his interests in [BBC-Equities-related] entities and not loans to Bravata." SEC Ex. 75, p. 1. Therefore, Kuzma's advances can be considered as nothing other than the initial investment in BBC Equities.

The funds received were to be used to invest in real estate. However, shortly after receiving Kuzma's funds, John Bravata purchased a 1995 Ferrari sports car. He contends that he paid for the Ferrari from a $119,000 commission check that he earned during his employment at New York Life Insurance Company. He maintains that the check was deposited into his personal account on June 9, 2006. The record shows, however, that the Kuzma funds were wired to the account earlier, when the account balance was less than $200. Luz Aguilar, an accountant from the SEC, testified that the New York Life commission check was in the amount of $60,000 and cleared the account on June 16, 2006. On June 13, 2006, Bravata wrote the Cauley Ferrari dealership a $5,000 check for a down payment on a $90,288 Ferrari sports car, and on June 16, 2006, Bravata issued an $85,268.40 cashier's check to Cauley Ferrari to complete the purchase of his Ferrari. Without the money he received from Kuzma and Lily Trabulsy, Bravata did not have enough money to purchase the Ferrari. Kuzma testified that he was unaware that Bravata purchased the Ferrari using Kuzma's money.

### 2. Fraudulent nature of the investment scheme

Money was solicited from investors at a series of luncheon seminars, where John Bravata, Antonio Bravata, and others made representations that the SEC contends were false. The defendants maintain that they made several disclosures to prospective investors that countermanded some of

the statements made at the presentation seminars. In fact, the first PPM disclosed the possibility that new investors may help pay distributions to old investors. It stated that BBC had not derived sufficient income from its investments for quarterly distribution payments, and all quarterly payments of the preferred distribution had been paid from the proceeds received from other investors. It also disclosed that there was no guarantee that the "Preferred Distribution" or any redemption amounts would be paid when due. The PPM also stated that "given the early stage of the Company's development, the start-up and operating expenses incurred and other factors, the Company would have insufficient resources to fully redeem all currently outstanding Class C shares" in the case of liquidation. SEC Ex. 38, p. 25. The PPM continued to state that no assurances could be given that acquisitions of real estate or real-estate-related investments made with the proceeds of its offering would produce a return on investment or generate any operating cash flow, and that the Company would use investor funds from "this" offering to pay the Preferred Distributions or redemption amounts to the holders of interests until the Company showed a profit from its operations (which it never did).

However, the uncontested evidence also demonstrates that many of the early investors — at least 150 — never received a PPM before investing. *See* SEC Ex. 39. BBC Equities did not distribute the first PPM until February 2007, and even then it was distributed only to certain prospective investors. From May 22, 2006 through February 6, 2007, a total of 15 BBC Equities investors wrote checks or sent wires totaling at least $3,274,073 to the defendants' bank accounts in exchange for Class A and C membership interests in BBC Equities securities. Before February 2007, John Bravata and Antonio Bravata gave presentations to prospective BBC Equities investors at "free lunch" seminars held in restaurants, which likely is not the environment one would frequent

-7-

when seeking "qualified investors." John Bravata told prospective investors his "first rules of investing," and he represented that those rules — maximizing return without imperiling principal — were the guiding philosophies of BBC Equities. He told prospective investors that BBC Equities secured their principal investments, which were guaranteed by certificates of deposit being held at Comerica Bank.

In fact, the value of BBC Equities's certificates of deposit never exceeded $413,000. Neither John nor Antonio Bravata told prospective investors before the PPM was constructed that BBC Equities's continued viability depended on a continuing flow of investor proceeds. John Bravata did tell the prospects that if BBC Equities's investors did not make money, then he did not make money. He explained that no manager at BBC Equities received a salary; they only got paid if BBC Equities made a profit. The evidence, however, shows that John Bravata did receive a salary and paid himself from investor proceeds regardless of whether BBC Equities earned a profit. The salary was paid through BBC Management, which in turn received payment from BBC Equities. Also before the PPM was constructed and distributed, John and Antonio Bravata both told prospective investors that BBC Equities guaranteed the returns on their investments and that BBC Equities offered 12% guaranteed returns.

Robert DeFauw, an Ann Arbor resident and executive at an automotive parts manufacturer, was one of the attendees at a presentation given by John Bravata at the Ritz Carlton in Dearborn in the summer of 2006. He testified that John Bravata told approximately 20 to 30 prospective investors that BBC Equities would use investor money to invest in real estate, and that as "angel investors," these prospective investors' money would be protected and they could only lose their money if all subsequent investors lost their money first. John Bravata made representations to the

-8-

group consistent with those described above.  SEC Exhibit 1, a video recording of presentations made by Antonio and John Bravata in Jaunary 2008, shows John Bravata making representations similar to those described by Mr. DeFauw.

James Deakin testified that he did not remember John Bravata making a sales pitch or guaranteeing investment returns at the Ritz Carlton presentation, and he says that he received a PPM in March 2007.  He remembers a reference to "angel investors," but he construed that term differently than Mr. DeFauw.  Mr. Deakin's lack of memory of representations described by Mr. DeFauw does not contradict DeFauw's testimony, nor does it establish that John Bravata did not make such representations.

DeFauw met with John Bravata in BBC Equities's Brighton office in September 2006.  At that meeting, Bravata told DeFauw that, in addition to guaranteeing DeFauw 10% annual interest payments, if Bravata did not double DeFauw's money, Bravata "wasn't doing his job."  DeFauw invested $50,000 in BBC Equities on September 22, 2006.  He made his investment decision based solely on the representations he received from Bravata and did not see a BBC Equities PPM until one was shown to him by the SEC staff in mid-2009.  The video evidence and testimony by investors establish that the disclosures and warnings stated in the PPM did not provide cover for the misrepresentations made by the defendants to prospective investors.

Nor did the PPMs reflect the full story of how investor funds were applied.  According to BBC's records, when the first PPM was used between February 2007 and April 2008, BBC Equities solicited and received approximately $21.2 million from 136 investors.  That PPM offered Class B membership interests in BBC Equities that were entitled to share pro rata with the holders of the Class A interests in profit distributions that would be declared by Bravata and Trabulsy; and Class

C membership interests, which yielded annual dividends of 8%, 10%, or 12%, redeemable on December 31, 2007, December 31, 2009, and December 31, 2011, respectively. It capped offering expenses and organizational costs associated with the offering (which included commissions and finder's fees) at $800,000. A second PPM was used between April 2008 and June 30, 2009, during which the defendants raised approximately $30.6 million from 369 investors. The second PPM offered Class D membership interests in BBC Equities yielding 8% annual priority distributions. It represented that going forward John Bravata and Richard Trabulsy would receive no finder's fees for the investments they sold to BBC Equities's investors.

The Second PPM reported that Bravata and Trabulsy originally contributed eight properties to BBC Equities and later acquired 28 additional real estate properties cumulatively valued at approximately $43 million, with only $34 million in mortgage debt. That suggests that about $9 million of the $21.2 million raised through the first PPM actually was directed toward the avowed purpose of the enterprise: investing in real estate. The second PPM was silent on that point. The second PPM represented that as of February 28, 2008, BBC Equities had a net asset value of $11,294,718, with total assets of $46,670,615 and total liabilities of $35,375,897. In fact, however, BBC Equities's own outside auditor reported that as of December 31, 2007, BBC Equities had total assets of $40,603,738 and total liabilities of $46,453,032.

### 3. Use of funds

Of the $55 million raised from investors, BBC Equities spent approximately $20.7 million on real estate purchases to acquire 71 real estate investment properties. According to the Receiver's report dated October 19, 2009, at the time the complaint was filed those properties all were encumbered well beyond their reasonable value and were essentially worthless. BBC Equities also

paid out approximately $12.5 million to the earlier investors who did not elect a reinvestment option for their interest payments.  As of June 30, 2009, BBC Equities had paid BBC Management approximately $6,082,628; and it had paid at least $2.1 million in purported commissions or "finder's fees" to BBC Equities' unregistered brokers for selling BBC Equities securities, including $386,521 to John Bravata and $216,045 to Richard Trabulsy.  BBC Equities also entered into an agreement with Bravata Financial Group to fund its operating expenses, and through April 30, 2009 it had transferred $7,225,062 from its bank account to Bravata Financial's bank account.  The defendants have offered no evidence to contradict these numbers.

Luz Aguilar testified that over the relevant period, John Bravata had outside income from sources other than the investment companies of approximately of $687,000, and Antonio Bravata earned at least $127,000 from his outside insurance sales.  However, it appears that Bravata Financial earned less than $715,000 from selling life insurance.

From May 2006 through May 2009, BBC Equities transferred $821,632, BBC Management transferred $250,634, and Bravata Financial transferred $1,324,087 to John and Shari Bravata's primary personal bank account.  The SEC compiled a list of the items purchased by John and Shari Bravata and Antonio Bravata that included luxury automobiles, jewelry, boats (along with Richard Trabulsy), trips, artwork, and construction of a lavish home in Brighton, Michigan.  The defendants, including Shari Bravata, argue that some of the items were purchased with funds that came from other sources, but they have not pointed to any evidence in the record to support those arguments.

The SEC also asserted that a putative investment in vacation property located in Bonita Springs, Florida never generated income and was used by the Bravatas as a personal vacation residence.  The defendants contend the Florida home was used for charity events and business

meetings and produced income, but there is no convincing proof of that claim. The Bravatas also made lavish use of corporate credit cards for personal purchases. Melissa Traver testified that the business's practice was for the card user to identify personal items, and a loan account would be established for those items. However, there is no evidence that the "loans" were repaid, and the purchases remained the obligation of the companies. Moreover, the amount of expenditures made by the Bravatas and Mr. Trabulsy during the period exceeded the amounts that they earned from outside income.

### 4. Essential failure of BBC Equities

Defendant John Bravata founded BBC Equities, he maintained, on two cardinal principles: first, protection of principal dollars; and second, maximizing returns without violating the first principle. It is fair to say that hundreds of investors found that philosophy attractive and entrusted Bravata with their money. But less than half of investors' money was used to purchase real estate — the main investment vehicle of BBC Equities as represented in presentations and the PPMs — and the real estate that was purchased was highly leveraged and risky. BBC Equities never was profitable, its operating expenses annually exceeded its revenue, and its net worth was increasingly negative in each of the three years of its existence. It is apparent that the only hope investors had of recovering their investments, not to mention realizing a return, was the recruitment of fresh money from new investors.

It also appears that neither John Bravata nor BBC Equities was meeting their financial obligations. On July 8, 2009, the Internal Revenue Service levied on a life insurance policy owned by John Bravata and held by Minnesota Life because of Bravata's unpaid taxes in excess of $178,000. Also on July 8, 2009, the Huntington National Bank obtained a $4.18 million judgment

against BBC Equities and Richard Trabulsy in the United States District Court for the Northern District of Ohio as a result of a defaulted promissory note relating to one of BBC Equities's investment properties. On July 16, 2009, the Huntington National Bank filed an action in a court in this district alleging that John Bravata also was liable as a guarantor on the same defaulted promissory note. Before the present lawsuit was filed, John Bravata paid a retainer to bankruptcy counsel.

John Bravata did not deny that he promised investors that their prospective returns would be guaranteed by certificates of deposit in Comerica Bank or that he would not take a salary unless BBC Equities did well. Instead, he invoked the Fifth Amendment as to those questions at the evidentiary hearing on the preliminary injunction motion. He did testify that he did not tell prospective investors that BBC Equities depended on its continued receipt of cash from investors to operate (although that statement appears in the PPMs) but Bravata made that admission in a conference call to BBC Equities investors on June 18, 2009. As disclosed by Defendants' Hearing Exhibit 143, on that conference call John Bravata said that the future of BBC Equities required "getting new investors into the company." He did not disclose to investors BBC Equities's ominous financial condition, instead asserting that "I am still very bullish on real estate." Def.s' Hrg. Ex. 143.

During that call, Bravata announced that BBC Equities was starting a new venture capital fund called BBC Capital, which eventually became known as Phoenix Venture Capital, LLC. John Bravata began distributing a Phoenix PPM on July 16, 2009. That PPM describes Phoenix as a "holding company" which holds "interests in companies that are engaged in providing insurance products and financial services, construction management and business coaching and consulting."

-13-

Hrg. Ex. 64 at 6.  Bravata was attempting to raise up to $200 million from the sale of "Class C shares" of Phoenix securities.

The PPM also makes reference to the possibility of acquiring an unnamed real estate subsidiary and a broker-dealer.  Both Melissa Traver and James Bravata made reference to the later transaction during their hearing testimony.  However, no first-hand information was presented at the hearing, there was no documentation presented that might hint at the possibility of such a transaction, and the likelihood of BBC Equities having the wherewithal to consummate such transactions in the spring or summer of 2009 was extremely remote in light of its dire financial condition.  Rather, the evidence points to the ineluctable conclusion that Phoenix Venture Capital was another effort by the defendants to perpetuate the investment pyramid by gathering more investors to support the promises made to earlier investors.

The Phoenix PPM suggests that the company might invest in industries including cable broadcasting, interactive media, oil and gas development, and pharmaceuticals.  However, it also represents that Phoenix investor funds would be used to "retire[] existing debt encumbering real estate owned by our subsidiaries," but fails to disclose that BBC Equities is the subsidiary or that BBC Equities's debts exceeded $128 million.  By mid-July 2009, some BBC Equities investors had begun converting their BBC Equities securities to Phoenix shares.  The SEC stepped in and filed its complaint in this case on July 26, 2009, and this Court's preliminary injunction followed.

B. Criminal prosecution

On May 12, 2011, the government unsealed an indictment charging John Bravata with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.  On July 14, 2011, the grand jury presented a first superseding indictment, which added Richard Trabulsy and Antonio Bravata as co-

defendants and fourteen counts of wire fraud under 18 U.S.C. § 1343 relating to certain named

investors.  First Superseding Indictment [dkt. #26], *United States v. Bravata*, No. 11-20314 (E.D.

Mich. July 14, 2011).  Count one of the first superseding indictment charged that from May 2006

through July 2009, the defendants:

> [D]id knowingly and willfully conspire, combine, and agree with each other to
> devise and execute a scheme and artifice to defraud and to obtain money and
> property from investors by means of false and fraudulent material pretenses,
> representations, and promises.
> . . .
> It was the purpose of the conspiracy for the defendants to defraud and obtain money
> by making false and fraudulent material representations to investors in order to
> induce or encourage investors to purchase shares in the defendants' company, BBC.

Pl.'s Mot. for Summ. J., Ex. 49, First Suprseding Indictment ¶¶ 9-11.  Count two charged the

defendants with securities fraud.  Counts three through sixteen charged John Bravata with wire fraud

in connection with fourteen specific BBC investors.  Trabulsy also was charged in Count three, and

Antonio Bravata was charged in Counts eight and ten.  Richard Trabulsy pleaded guilty to Count

three of the superseding indictment on October 7, 2011, and the Bravatas proceeded to trial, which

began on February 26, 2013 and concluded on March 27, 2013.  The jury found John Bravata guilty

of one count of conspiracy to commit wire and mail fraud, and fourteen counts of wire fraud.  The

jury found Antonio Bravata guilty of conspiracy to commit wire and mail fraud, not guilty of one

count of wire fraud, and was unable to reach a decision on another count of wire fraud.

In finding John and Antonio Bravata guilty of conspiracy to commit wire fraud, the jury in

the criminal case necessarily determined that both defendants "did participate in a scheme to defraud

investors of BBC, and to obtain money and property by means of false and fraudulent material

pretenses, representations and promises."  Pl.'s Mot. for Summ. J., Ex. 50, Jury Instructions at 16.

With respect to Antonio Bravata, the jury determined that he "willfully agreed to participate and did

-15-

participate in the aforementioned scheme beginning in 2007 and continuing up to and including July 2009." *Ibid.* And the court specifically instructed the jurors that in order to convict either defendant on the conspiracy charge, they must find that the government had proved beyond a reasonable doubt that (1) "two or more persons conspired, or agreed, to commit a federal crime, here, Mail Fraud or Wire Fraud"; (2) "each of the defendants joined the conspiracy knowingly and voluntarily"; and (3) "that [each] defendant knew the conspiracy's main purpose, and that he voluntarily joined it intending to help advance or achieve its goals." *Id.* at 17, 19.

On December 11, 2013, the Court sentenced John Bravata to 240 months on each count to be served concurrently. Judgment [dkt. #353]. The Court found that Bravata's conduct caused a total loss to investors of $44,533,437.86 and ordered him to pay restitution in that amount. Antonio Bravata was sentenced to 60 months in prison on the conspiracy count. The Court found that Antonio Bravata's conduct caused a total loss to investors of $44,533,437.86 and ordered him to pay restitution of $7 million.

### C. Shari Bravata

At the evidentiary hearing on the motion for preliminary injunction, Shari Bravata testified that she was not employed from 2006 through 2009 and that her only source of income during that period was from her husband. During that period, BBC Equities spent more than $936,000 to make mortgage payments on a house in Bonita Springs, Florida, which Shari Bravata and her family used as a personal vacation home. The company also spent more than $762,000 to build a personal residence for the Bravatas in Brighton, Michigan. Pl.'s Mot. for Summ. J., Ex. 48, Aguilar decl. ¶ 48. Ms. Bravata charged more than $28,883 for personal items including vacations, clothing, and dining out to credit cards held by BBC Equities, and she testified that "nothing I charged on [the

cards] was [related to] BBC Equities business." Hr'g Tr. at 100. BBC Equities never was reimbursed for those charges.

John Bravata bought his wife a Maserati automobile, for which he paid $84,902. Shari Bravata testified that the Maserati was "my car," and was titled in her name. Aguilar decl. ¶ 10; Hr'g Tr. at 89-91. Bravata also spent at least $59,000 on jewelry for his wife. Aguilar decl. ¶ 10; Hr'g Tr. at 91-92. The SEC asserts that the Receiver recovered $34,000 from the sale of the Maserati, and that any offset for the value of the car therefore should not exceed that amount. The SEC contends that the Receiver has not recovered and does not possess any other assets of value that could be imputed as part of any offset against recovery from Shari Bravata.

### D. Procedural history

The SEC filed its complaint in this case on July 26, 2009. In its 80 substantive paragraphs, the complaint raised claims under various federal securities laws and regulations, contending that the defendants: violated 15 U.S.C. §§ 77e(a) and (c) by selling unregistered securities (Count I); violated 15 U.S.C. § 77q(a)(1) by employing a scheme to defraud to sell securities (Count II); violated 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3) by obtaining money or property through the use of false and fraudulent statements (Count III); violated 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 by employing a fraudulent scheme to sell securities (Count IV); and violated 15 U.S.C. § 77o(a) by selling securities without registering as broker dealers (Count V). The complaint also asserted a "demand for equitable relief" in Count VI.

On August 4, 2009, the Court granted the plaintiff's motion for a preliminary injunction and continued its order freezing assets of the corporate and individual defendants. On September 2, 2009, the Court appointed Earle I. Erman as Receiver of the corporate entities BBC Equities, LLC

-17-

and Bravata Financial Group, LLC.  On August 31, 2009, defendants John J. Bravata, Antonio M. Bravata, and Shari A. Bravata, then represented by counsel, filed their answer to the original complaint with affirmative defenses and jury demand.

The Court held an evidentiary hearing on the plaintiff's request for a preliminary injunction on October 21, 22, and 30, 2009, and January 14, 2010.  Ten witnesses testified at the hearing, including each of the Bravata defendants, and the parties offered a number of documents as exhibits, along with several video recordings.  Thereafter, the case was stayed for a period of time after the defendants' attorney of record was indicted in an unrelated securities fraud case.  On January 31, 2011, after the stay was lifted, the Court filed its opinion and order setting forth its factual findings based on the evidentiary hearing testimony

On March 9, 2011, the SEC filed its motion to amend the complaint, which the Court granted.  The modestly extended 90-paragraph amended complaint asserted the same counts under the same cited statutes as the original complaint, and it contained substantially the same factual allegations with a few additions.  Defendant John Bravata filed a response to the motion to amend, which mainly addressed his factual disputes with the SEC's claims.

On June 14, 2011, the Court entered an order granting the SEC's motion to amend the complaint, deeming the amended complaint filed, and staying the case pending the outcome of Bravata's criminal trial.  On April 2, 2013, after the conclusion of the criminal trial, the Court entered an order dissolving the stay and ordered the defendants to answer the amended complaint. Because none of the defendants (all of whom by then proceeding *pro se*) filed any formal answer to the complaint, the SEC filed a motion for default judgment on June 21, 2013.  The Court denied the plaintiff's motion on September 10, 2013 and ordered the parties to file dispositive motions by

-18-

November 15, 2013.  The SEC filed its motion on that date, and each of the individual defendants has filed a response.

In the meantime, the SEC resolved its case against defendant Richard Trabulsy and moved for the entry of a partial consent judgment against him alone.  The Court denied that motion because the parties did not provide adequate grounds for entry of a judgment against less than all the defendants.  *See* Fed. R. Civ. P. 54(b).  With the adjudication of this summary judgment motion, however, the claims against all the defendants are resolved.

## II.  Liability

In its motion for summary judgment, the SEC argues *first* that John and Antonio Bravata's convictions for wire fraud and conspiracy to commit wire fraud are sufficient to justify judgment in its favor in this civil securities fraud action based on the same factual circumstances, because the jury necessarily determined each essential element of the securities fraud claims when it rendered a verdict on the criminal wire fraud and conspiracy charges.  The SEC relies on the doctrine of collateral estoppel and requests judgment as a matter of law on Counts II, III, and IV of the complaint.  The SEC also argues that the undisputed evidence presented at the preliminary injunction hearing and the criminal trial provides a separate and adequate basis for finding that there is no genuine material dispute that the defendants intentionally made fraudulent representations to investors in the course of selling shares in BBC.

*Second*, the SEC argues that it is undisputed that the defendants never were registered as broker dealers and that the investments in BBC Equities never were the subject of any registration statement.  The SEC contends that there is no question that the investments meet the Supreme Court's definition of "securities."  The SEC states that the defendants have offered no evidence that

they were entitled to any of the statutory exemptions that would permit them to operate as broker dealers without a registration.

*Third*, the SEC argues that permanent injunctive relief is warranted because (1) the defendants' violations were repeated and occurred over the course of three years; (2) the losses were substantial and the violations egregious; (3) the defendants have offered no assurances that they will comply with securities laws in the future, and continue to contest their liability and guilt in the criminal matter; and (4) John Bravata has a history of disobeying orders of the Court and previously has been held in contempt for his incorrigible actions. The SEC also points out that the defendants are relatively young and will have the opportunity to commit future violations after they are released from prison, if their conduct is not enjoined.

Fourth, the SEC argues that disgorgement is warranted against all of the defendants, including Shari Bravata, because it is undisputed that each of them received the proceeds from the fraudulent enterprise. The SEC contends that joint and several liability is warranted where multiple defendants have received fraudulent funds, and that the testimony supplied by its forensic accountant Luz Aguilar is sufficient to establish that its figure of $5,201,494.89 is a reasonable approximation of the amount collectively received by the defendants. The SEC also asks that prejudgment interest in the amount of $1,251,074.02 also be added to the amount adjudged against the defendants.

Finally, the SEC argues that the maximum "tier three" civil penalties of $130,000 per violation are warranted against John and Antonio Bravata because, as the judgment in the criminal case establishes, their conduct involved "fraud, deceit, or manipulation," and it caused substantial losses in excess of $44 million to investors.

-20-

The defendants argue that summary judgment is not appropriate.  Their arguments will be addressed in more detail below.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Sixth Circuit has explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a), (b). Such a motion presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." 576 F.3d at 558 (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Id.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'"  *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  A party opposing a motion

for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Thus, [t]he mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]."  350 F.3d at 546 (quoting 477 U.S. at 252) (quotations marks omitted).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact.  *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000).  A fact is "material" if its resolution affects the outcome of the lawsuit.  *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).  "Materiality" is determined by the substantive law claim.  *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000).  An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party."  *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden.  *Vance v. Latimer*, 648 F. Supp. 2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant

submits evidentiary materials to establish all of the elements of the claim or defense").   In his commentary on affirmative motions for summary judgment, Judge William Schwarzer explains:

> When the moving party bears the burden of persuasion on the issue at trial, its showing must sustain that burden as well as demonstrate the absence of a genuine dispute.  Thus, it must satisfy both the initial burden of production on the summary judgment motion — by showing that no genuine dispute exists as to any material fact — and the ultimate burden of persuasion on the claim — by showing that it would be entitled to a directed verdict at trial.

William W. Schwarzer, et al., *The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 477-78 (1992) (footnotes omitted).

### A.  Fraud claims

John Bravata reargues at considerable length his previously asserted position that the claims of fraud are negated by the fact that investors received a private placement memorandum in which certain disclosures and warnings were included.  He cites various authorities on the law of contracts, the statute of frauds, warranties, and the parol evidence rule for the proposition that oral promises, warranties, and representations are unenforceable in the face of a written contract between the parties.  However, this is not a contract dispute, and the government is not seeking to enforce any promise allegedly made by Bravata, oral or otherwise.  Instead, the government seeks to enforce federal civil securities laws and recover against Bravata on behalf of investors for the now undisputedly false representations that he and his co-defendant made in the course of selling investment interests in the BBC Equities enterprise.

Antonio Bravata argues (1) that he never was employed by BBC Equities and that everything he did in the course of selling investments in the company was "done under the instruction of my superiors at Bravata Financial Group"; (2) he "never knowingly made false statements" in relation to the sales of interests in BBC; (3) he was found not guilty on the individual fraud counts; (4) the

judge in the criminal case had not (at the time of the filing of the response) entered an order of restitution; (5) he has filed an appeal of his criminal conviction; and (6) the testimony at the criminal trial did not establish that he had knowledge of any scheme to defraud.

Neither defendant cites portions of the record in support of their arguments, except for references to the PPMs and general references to Richard Trabusy's testimony at the criminal trial. The fact issues they attempt to generate are foiled, however, by their criminal convictions.

The doctrine of collateral estoppel provides that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Where the judgment that a party looks to for preclusion is a federal court judgment, the Court must "look to federal law to determine its preclusive effect." *Hamilton's Bogarts v. Michigan*, 501 F.3d 644, 650 (6th Cir. 2007); *see also EB-Bran Productions v. Warner*, 242 F. App'x 311, 312 (6th Cir. 2007) ("[A] federal court applies *federal* law in determining the preclusive effect of a prior federal judgement . . . at least where jurisdiction in the prior litigation was based on a federal question."). The Sixth Circuit has listed four requirements for the application of collateral estoppel:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Hamilton's Bogarts*, 501 F.3d at 650 (quoting *NAACP, Detroit Branch v. Detroit Police Officers Ass'n (DPOA)*, 821 F.2d 328, 330 (6th Cir. 1987)). All of those requirements have been satisfied here.

-24-

"[P]rior criminal convictions may work an estoppel in favor of the government in subsequent civil proceedings," *Emich Motors Corp. V. General Motors Corp.*, 340 U.S. 558, 568-69, 71 (1951), and federal courts in this circuit and others routinely grant summary judgment in civil securities fraud actions where the defendant has been convicted on criminal fraud or conspiracy charges based on the same factual circumstances. *E.g.*, *SEC v. C.J.'s Fin.*, No. 10-13083, 2012 WL 3600239 (E.D. Mich. July 30, 2012) (wire fraud), *report and recommendation adopted*, 2012 WL 3597644 (E.D. Mich. Aug. 21, 2012); *SEC v. Fisher*, No. 07-12552, 2011 WL 3652195 (E.D. Mich. Aug. 19, 2011) (conspiracy); *SEC v. Quinlan*, No. 02-60082, 2008 WL 4852904 (E.D. Mich. Nov. 7, 2008) (conspiracy to commit wire fraud), *aff'd*, 373 F. App'x 581 (6th Cir. 2010); *SEC v. Blackwell*, 477 F. Supp. 2d 891 (S.D. Ohio 2007) (insider trading).

The elements of the civil fraud claims in this case and the criminal fraud claims alleged in the superseding indictment overlap. Section 17(a) of the Securities Act of 1933 makes it unlawful for any person, directly or indirectly in the offer or sale of any securities:

> (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Section 10(b) of the Exchange Act of 1934 makes it unlawful for any person, directly or indirectly:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

-25-

15 U.S.C. § 78j(b).  Rule 10b–5, promulgated under the authority of this statutory provision, makes it unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

"To establish violations of these anti-fraud provisions, the SEC must show that the defendants engaged in (1) misrepresentations or omissions of material facts (2) made in connection with the offer, sale or purchase of securities (3) with scienter on the part of the defendants." *SEC v. George*, 426 F.3d 786, 792 (6th Cir. 2005) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976)).  "A fact is material if a substantial likelihood exists that (1) a reasonable shareholder would consider the fact important in making his investment decision and (2) a reasonable shareholder would view the information as having significantly altered the total mix of information."  *Ibid.* (citing *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).  "Scienter may be established by proof of recklessness—'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.'"  *Ibid.* (citing *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979)).  "Unlike [in] a private securities fraud action, attribution and reliance are not required elements in SEC enforcement actions."  *SEC v. Conaway*, 698 F. Supp. 2d 771, 876 n.83 (E.D. Mich. 2010) (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998); *SEC v. First Jersey Securities*, 101 F.3d 1450, 1471 (2nd Cir. 1996)).

-26-

"The elements of wire fraud, as prescribed under 18 U.S.C. § 1343 are as follows: (1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Prince*, 214 F.3d 740, 747-48 (6th Cir. 2000) (footnotes omitted).

"A conviction for conspiracy to commit [wire] fraud [under 18 U.S.C. § 1349] requires proof beyond a reasonable doubt that the defendant knowingly and willfully joined in an agreement with at least one other person to commit an act of . . . fraud and that there was at least one overt act in furtherance of the agreement." *United States v. Warshak*, 631 F.3d 266, 308 (6th Cir. 2010).

Summary judgment is justified on Counts II, III, and IV of the amended complaint on the basis of collateral estoppel, because the defendants were convicted of conspiracy to commit wire and mail fraud and wire fraud involving the same factual circumstances involved in this case. There can be no dispute that their criminal trial resulted in a final judgment and that the defendants had a full and fair opportunity to litigate each element of the charges against them in that proceeding. There also is no dispute that the factual premises of both proceedings are identical.

There can be no genuine issues of material fact on these counts, because the jury's verdicts in the criminal action establish, at a minimum, that each defendant willfully participated in a scheme to defraud BBC Equities investors, and did so knowingly. Moreover, as to John Bravata, the verdict also establishes that he committed fourteen other specific violations by making false statements to the investors named in the indictment.

Antonio Bravata argues that he was found not guilty on one of the substantive fraud counts and the jury did not reach a decision on the other. However, the acquittal and hung jury on the two individual fraud charges are irrelevant and not preclusive of summary judgment in this case, because

-27-

the criminal charges required a higher standard of proof. *SEC v. Ridenour*, 913 F.2d 515, 518 (8th Cir. 1990). Moreover, the two individual counts only addressed misrepresentations allegedly made to two named investors, and the SEC still is entitled to summary judgment if Antonio Bravata participated in even one other instance of conduct involving a scheme to defraud, which the verdict on the conspiracy charge necessarily required for a finding of guilt.

Convictions for mail fraud, wire fraud, securities fraud, and conspiracy to commit securities fraud suffice to establish claims for securities fraud based on the same facts in a related civil action. *SEC v. Zandford*, 535 U.S. 813 (2002) (wire fraud based a "course of business" involving repeated undisclosed sales of securities held in client accounts); *SEC v. Farkas*, No. 13-1757, --- F.3d ---, 2014 WL 522805 (4th Cir. Feb. 11, 2014) (wire fraud, bank fraud, and conspiracy to commit fraud); *SEC v. Quinlan*, 373 F. App'x 581 (6th Cir. 2010) (filing false statements and conspiracy to commit fraud); *SEC v. Palmisano*, 135 F.3d 860 (2d Cir. 1998) (mail fraud, wire fraud, money laundering, and securities fraud — Ponzi scheme); *SEC v. Gruenberg*, 989 F.2d 977 (8th Cir. 1993) (wire fraud and securities fraud); *see also SEC v. C.J.'s Fin.*, No. 10-13083, 2012 WL 3600239 (E.D. Mich. July 30, 2012) (wire fraud), *report and recommendation adopted*, 2012 WL 3597644 (E.D. Mich. Aug. 21, 2012); *SEC v. Fisher*, No. 07-12552, 2011 WL 3652195 (E.D. Mich. Aug. 19, 2011) (conspiracy to commit wire fraud and wire fraud); *SEC v. Quinlan*, No. 02-60082, 2008 WL 4852904 (E.D. Mich. Nov. 7, 2008) (conspiracy and making false statements), *aff'd*, 373 F. App'x 581 (6th Cir. 2010); *SEC v. Blackwell*, 477 F. Supp. 2d 891 (S.D. Ohio 2007) (insider trading).

The defendants have repeated the same two basic contentions in this case, which are that (1) certain disclosures made in the PPM materials vitiate all the charges of fraud; and (2) the jury's verdict established fraud only as to the fourteen specific investors named, and not any of the other

-28-

investors in the company.  The criminal jury, the sentencing court, and this Court already have considered and decisively rejected both arguments.

As the government points out, the criminal jury considered all of the evidence that John Bravata has submitted in support of his response to the government's motion, and it squarely rejected his defense by finding him guilty of conspiracy to commit fraud and fourteen specific instances of fraud.  This Court also held, in its opinion granting the government's motion for preliminary injunction, that the PPM materials were "no cover" against the allegations of fraud.  The sentencing court likewise rejected this argument.  On August 22, 2013, the judge in the criminal case denied a motion for judgment of acquittal filed by John Bravata and joined in by Antonio Bravata.  That judge specifically rejected the defendants' argument that certain disclosures and warnings included in the "private placement memorandum" that some investors had received vitiated the fraud charges based on oral statements made by the defendants when soliciting investments:

> The fact that a victim received a document — a Subscription Agreement — that contained cautions or warnings, did not give the Defendants a license to defraud, and does not undercut or eviscerate the overwhelming evidence of Defendant's and his co-conspirator's intentionally fraudulent oral representations to the victim/investors named in the indictment.

Order Denying Def.'s Mot for Judgment of Acquittal [dkt. #274], *United States v. Bravata*, No. 11-20314 (E.D. Mich. Aug. 22, 2013).

As to the extent of the fraud involved in the BBC enterprise, the judge in the criminal case rejected the defendants' argument that the harm was limited to only those specific investors named in the indictment, when he assessed a loss amount of more than $44 million — nearly the entire amount raised from all investors by BBC — in the judgments of sentence against each of them.

John Bravata contends that "the heart of this case is based also on *Webb v. First of Michigan Corp.*, 195 Mich. App. 470, 491 N.W.2d 851 (1992)." However, *Webb* was a state court case in which the plaintiff alleged common law fraud, and therefore is irrelevant to an action for enforcement of federal securities law and not binding on this Court. Moreover, *Webb* is distinguishable because there the purveyors of the private placement investments made only general promises that investors could expect 32% returns and that the investment was "risk free"; assurances which the court found to be either mere puffery or contradicted by the disclosures of risk in the prospectus offered to investors. Here, the defendants made far more specific and undisputedly false representations, such as that investments by BBC Equities were secured by certificates of deposit held by Bank of America, that the investment strategy sought to maximize return without putting principal at risk, and that the defendants received no compensation unless the firm made a profit for investors. *Webb* also evidently involved an enterprise that simply did not work out as hoped due to adverse market conditions; not, as here, a Ponzi scheme where most funds raised from new investors were used to pay dividends to prior investors, in order to solicit an ever-growing pool of contributions from more and more investors — an "investment strategy" which, it is undisputed, the defendants never disclosed to their investors in any way.

The SEC is entitled to a judgment as a matter of law on Counts II, III, and IV of the amended complaint.

B.  Sale of unregistered securities

-30-

John Bravata argues that there are genuine issues of material fact regarding whether interests in BBC Equities were "securities." "The federal securities laws define 'security' as including an 'investment contract.'" *SEC v. Merklinger*, 489 F. App'x 937, 940 (6th Cir. 2012) (quoting 15 U.S.C. §§ 77b(a)(1), 78c(a)(10)). In *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Supreme Court set forth the factors relevant to deciding whether a transaction qualifies as an "investment contract." Under the *Howey* test, "[a]n investment contract involves (1) an investment of money (2) in a common enterprise (3) with a reasonable expectation of profits to be derived solely from the efforts of others." *SEC v. Prof'l Associates*, 731 F.2d 349, 352-53 (6th Cir. 1984). The certificates BBC Equities sold to its investors neatly fits this definition. The record does not allow a factual dispute on this point.

"The Securities Act and the required filing of registration statements under Section 5 exist to protect investors by requiring they receive sufficient information to make informed investment decisions." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321 (6th Cir. 2013) (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953)). "Sections 5(a) and 5(c) of the Securities Act together require that securities be registered before they can be sold or offered for sale." *Ibid.* (citing 15 U.S.C. § 77e(a), (c); *SEC v. Holschuh*, 694 F.2d 130, 137 (7th Cir. 1982)). "A party can violate the registration requirements of Sections 5(a) and (c) of the Securities Act through even indirect involvement in the public sale of unregistered securities." *Ibid.* Section 5(a) of the Securities Act provides that:

> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or

instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a).  A parallel provision in section 5(c) prohibits "offer[s] to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security."  15 U.S.C § 77e(c).

"To establish a prima facie violation of § 5, the SEC must prove the following: '(1) [that] no registration statement was in effect for the securities; (2) that the defendant directly or indirectly sold or offered to sell the securities; and (3) that means of interstate transportation or communication were used in connection with the offer or sale.'"  *SEC v. AIC, Inc.*, No. 11-176, 2013 WL 5134411, at *9 (E.D. Tenn. Sept. 12, 2013) (citing *Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 124 n.4 (2d Cir. 1998), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010).  "Scienter is not an element of a § 5 violation because that section imposes strict liability on sellers of securities."  *Ibid.* (citing *SEC v. Sierra Brokerage Servs.*, 608 F. Supp. 2d 923, 939 (S.D. Ohio 2009)).  Once the SEC establishes a *prima facie* case, the defendant bears the burden of showing that the challenged securities transactions fall within one of the enumerated exemptions from registration.  *Ibid.* (citing *Ralston Purina*, 346 U.S. at 126; *Sierra Brokerage*, 608 F. Supp. 2d at 939)).

There can be no reasonable dispute that the investments in BBC Equities were "securities" under the *Howey* standard, because they unquestionably were "(1) an investment of money (2) in a common enterprise (3) with a reasonable expectation of profits to be derived solely from the efforts of others." *SEC v. Prof'l Associates*, 731 F.2d 349, 352-53 (6th Cir. 1984).  Moreover, as the government points out, the PPM materials specifically referred to the investments as securities,

which belies the defendants' claims to the contrary.  The SEC is entitled to judgment as a matter of law on Count I of the amended complaint.

### C.  Sale by unregistered broker dealer

"Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1), makes it 'unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered [with the Commission].'"  *SEC v. George*, 426 F.3d 786, 792 (6th Cir. 2005) (quoting 15 U.S.C. § 78o(a)(1)).  "A 'broker' . . . is defined as 'any person engaged in the business of effecting transactions in securities for the accounts of others.'"  *Id.* at 797 (quoting 15 U.S.C. § 78c(a)(4)(A)).  "[F]actors that may qualify an individual as a broker [include] regular participation in securities transactions, employment with the issuer of the securities, payment by commission as opposed to salary, history of selling the securities of other issuers, involvement in advice to investors and active recruitment of investors."  *Ibid.*

Under certain circumstances an "associated person of an issuer of securities," may be exempted from the registration requirements under section 15(a), but that exemption does not apply where the person was "compensated in connection with his participation by the payment of commissions or other remuneration based either directly or indirectly on transactions in securities." 17 C.F.R. § 240.3a4-1(a)(2); *see also SEC v. Rabinovich & Associates, LP*, No. 07-10547, 2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008) ("Although [defendant] was associated with . . . the issuer of the securities in question, he does not qualify for this exception, because he received compensation for selling the securities.")

-33-

The defendants make no attempt to refute these claims, and the Court already has found that it is undisputed that neither of the defendants ever was registered as a securities dealer.  The SEC is entitled to judgment as a matter of law on Count V of the amended complaint.

### III.  Remedies

The SEC has requested that if liability is determined in its favor, the Court should enjoin permanently defendants John and Antonio Bravata and their entities from violating the securities laws, impose civil penalties against them, and order all the defendants, including Shari Bravata, to disgorge their ill-gotten gains.  Defendants John and Antonio Bravata have not addressed the government's requests for specific remedies.  "Relief defendant" Shari Bravata argues that she is entitled to a trial on the issue of disgorgement, because (1) no court ever has decided whether her use of company credit cards or any of her other acts violated federal securities laws; (2) the SEC "[c]laims that $28,000 was used by [the] relief defendant, but wants [a] $1,000,000 judgment"; (3) there is a material dispute over the start date of the investment enterprise; (4) Shari Bravata never was employed by BBC Equities and there never was any proof that she directly participated in the scheme to defraud; and (5) the criminal trial only established that fourteen specific investors were victims of the fraud, and there was "no proof" that the balance of contributions by investors were secured by fraud.  Shari Bravata also contends that some of the assets seized by the government were received by inheritance or bought by her with funds unrelated to BBC Equities, but she included no documents or other proofs in her response to support this claim.  Shari Bravata also argues that she does not have access to transcripts of the prior proceedings in order to prepare a more complete response, and that she should not be subject to any judgment because all her assets already have been seized by the government.

-34-

### A.  Disgorgement

Disgorgement is an appropriate remedy in this case against all defendants, including Shari Bravata.  Shari Bravata is not entitled to a jury trial on this remedy, nor is it necessary to find that she personally violated the securities laws.  Disgorgement is an equitable remedy, *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985), and where this is the only relief sought against a relief defendant, there is no right to a jury trial on the amount of disgorgement to be awarded, *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 95-97 (2d Cir. 1978); *SEC v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993).

"A relief defendant (sometimes referred to as a nominal defendant) may 'be joined to aid the recovery of relief' and 'has no ownership interest in the property which is the subject of litigation.'" *SEC v. George*, 426 F.3d 786, 798 (6th Cir. 2005) (citing *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir.1991)).  "'Federal courts may order equitable relief against . . . a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.'"  *Ibid.* (quoting  *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)).

This Court has the equitable power to order disgorgement of funds received by the defendants as a result of the fraudulent scheme.  "The purpose of disgorgement is to force 'a defendant to give up the amount by which he was unjustly enriched' rather than to compensate the victims of fraud." *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985) (citing *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 102 (2d Cir. 1978)).  "Once the Commission has established that a defendant has violated the securities laws, the district court possesses the equitable power to grant disgorgement without inquiring whether, or to what extent, identifiable private parties have

been damaged by [the defendant's] fraud." *Ibid.* (citing *SEC v. Washington County Utility District*, 676 F.2d 218, 227 (6th Cir. 1982)). "Calculation of the defendant's economic gain need not be exact, and determination of the appropriate amount is left to the sound discretion of the trial court." *SEC v. Conaway*, 697 F. Supp. 2d 733, 747 (E.D. Mich. 2010). The amount of "disgorgement need only be a reasonable approximation of profits causally connected to the violation," and once the government has offered sufficient evidence to establish that reasonable approximation, the defendant is "then obliged clearly to demonstrate that the disgorgement figure was not a reasonable approximation." *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1231-32 (D.C. Cir. 1989).

Where multiple defendants have benefitted from the same ill-gotten gains, joint and several liability is appropriate. *SEC v. Berger*, 11-10403, 2011 WL 528843, at *3 (E.D. Mich. Feb. 8, 2011). The district court "may add prejudgment interest to the disgorgement amount to avoid a defendant benefitting for the use of his ill-gotten gains interest free." *SEC v. Conaway*, 697 F. Supp. 2d 733, 747 (E.D. Mich. 2010) (citing *SEC v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978)). The rate will be calculated based on interest rate the IRS imposes for underpayment of taxes, *see, e.g.*, SEC Rules & Regulations, 60 Fed. Reg. 32738, 32788 (June 23, 1995). *See SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1476-77 (2d Cir. 1996).

The Court will order John Bravata and Shari Bravata, jointly and severally, to disgorge the $5,201,494.89 that they received as proceeds of the BBC Equities scheme, plus $1,251,074.02 in prejudgment interest. The unrebutted testimony of the government's forensic accountant, Luz Aguilar, establishes that this is a reasonable approximation of the amounts received. Pl.'s Mot. for Summ. J., Ex. 48, Aguilar decl. ¶¶ 12, 14. Neither defendant has submitted any evidence to suggest that these figures are not a reasonable approximation of the proceeds they received. The Court

-36-

likewise will order Antonio Bravata to disgorge the $444,384 that he received as proceeds of the BBC Equities enterprise, plus prejudgment interest of $98,474.14.  Aguilar decl. ¶¶ 13, 15.

### B.  Permanent injunction

The Securities Act authorizes the district court to impose a permanent injunction against future violations of the Act where the government has established that past violations occurred.  15 U.S.C. § 77t(b), 78u(d).  To establish the need for injunctive relief, the SEC must show "a reasonable and substantial likelihood that [the defendant], if not enjoined, [will] violate the securities laws in the future."  *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir. 1984) (citing *SEC v. Washington County Utility District*, 676 F.2d 218, 227 (6th Cir.1982)).  The Sixth Circuit has held that the factors relevant in determining the likelihood of future violations are: (1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the degree of scienter involved; (4) the sincerity of the defendant's assurances, if any, against future violations; (5) the defendant's recognition of the wrongful nature of his conduct; (6) the likelihood that the defendant's occupation will present opportunities for future violations; and (7) the defendant's age and health.  *Ibid.*

All of the relevant factors suggest that an injunction is warranted to prevent future securities law violations by defendants John and Antonio Bravata, because (1) the conduct of the defendants was egregious and resulted in a loss of more than $44 million to investors, as assessed by the sentencing court; (2) the violations were repeated and extended, taking place over a period of three years and involving hundreds of investors; (3) the defendants have not offered any acknowledgment of their guilt or any assurances that they will not commit future violations, and they continue to contest their guilt on appeal of the criminal verdict against them; and (4) the defendants are reasonably young and likely will have a chance to commit future violations when released from

2:09-cv-12950-DML-VMM   Doc # 648   Filed 03/06/14   Pg 38 of 40   Pg ID 10398

prison.  When the SEC filed its complaint in this case, BBC Equities, operated by the individual

defendants, was attempting to engage in a further pyramid scheme to solicit funds from investors

through Phoenix Venture Capital, LLC. Those funds would have been used to perpetuate the

defendants' illegal scheme, as the funds generated by that offering were to be used to pay dividends

to earlier BBC investors.  Since this case has been pending, the defendants have not indicated any

intention of changing course.

### C.  Civil penalties

"Congress incorporated penalties into the securities laws when it enacted the Securities Law

Enforcement Remedies Act of 1990 (the 'Remedies Act').  The Remedies Act is now codified at

Section 21(d)(3)(A) of the Exchange Act (15 U.S.C. § 78u(d)(3)(A))."  *SEC v. Conaway*, 697 F.

Supp. 2d 733, 747 (E.D. Mich. 2010).  The Remedies Act provides for three penalty tiers:

> In the absence of fraud, a first tier penalty applies.  748 15 U.S.C. § 78u(d)(3)(B)(i).
> A second tier penalty applies where the violation involved "fraud, deceit,
> manipulation, or deliberate or reckless disregard of a regulatory requirement."  15
> U.S.C. § 78u(d)(3)(B)(ii).  A third tier penalty applies where the violation involved
> "fraud, deceit, manipulation . . ." and "directly or indirectly resulted in substantial
> losses or created a significant risk of substantial losses to other persons." 15 U.S.C.
> § 78u(d)(3)(B)(iii).

*Conaway*, 697 F. Supp. 2d at 747-48.  For the time period of the alleged violations, the maximum

third tier penalty is "the greater of (I) $[130,000] . . . or (II) the gross amount of pecuniary gain to

[the] defendant as a result of the violation."  15 U.S.C. § 78u(d)(3)(B)(iii); 17 C.F.R. § 201.1003.

Federal courts variously have evaluated the calculation of fines "per violation" by reference to mean

(1) per claim brought against the defendant, *SEC v. Shehyn*, 04-2003, 2010 WL 3290977, at *8

(S.D.N.Y. Aug. 9, 2010); (2) per misrepresentation made by the defendant, *SEC v. Coates*, 137 F.

-38-

Supp. 2d 413, 430 (S.D.N.Y. 2001); and (3) per investor defrauded by the defendant, *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998).

The record leaves no doubt about the defendants' fraudulent and intentional conduct, and the appropriate response is assessment of the maximum "tier three" penalties against defendants John and Antonio Bravata.  The SEC does not express any apparent preference among the three methods for calculating the penalty (per claim, per misrepresentation, or per investor).  Two out of the three methods result in a total fine of $1,820,000 against defendant John Bravata, based on the fourteen specific misrepresentations to individual investors of which he was found guilty by the jury in the criminal case.  Although there were no individual fraud counts sustained against Antonio Bravata, his conviction for conspiracy and the claims for civil fraud in the present matter suggest that he should be assessed a fine of $130,000 representing at least one "violation" or "claim."

The Court finds this calculation sensible and supported by the undisputed facts in the record.  Although there were 440 individual investors, proving discrete misrepresentations by these defendants to each investor would be time-consuming, and the SEC has not sought that approach.  The criminal convictions establish conclusively the fourteen misrepresentations upon which this Court's judgment will be based.

## IV.  Conclusion

There are no material fact disputes on any of the elements of the plaintiff's claims against the defendants, and the plaintiff has established those elements by a preponderance of evidence.  The plaintiff therefore is entitled to a judgment in its favor as a matter of law finding defendants John J. Bravata, Antonio M. Bravata, BBC Equities, LLC, and Bravata Financial Group, LLC liable on Counts I through V of the amended complaint.  Defendants John J. Bravata and Antonio M. Bravata

also are liable for civil penalties.  The plaintiff also has established that defendant Shari Bravata has received ill gotten gains from the fraudulent activity, and no material fact dispute exists on that point.  Therefore, a judgment of disgorgement will enter against the defendants, including defendant Shari Bravata.

Accordingly, it is **ORDERED** that the plaintiff's motion for summary judgment [dkt. #612] is **GRANTED**.

It is further **ORDERED** that judgment will be entered determining liability and ordering a permanent injunction against defendants, John J. Bravata, Antonio M. Bravata, BBC Equities, LLC, and Bravata Financial Group, LLC, civil penalties will be assessed against defendants John J. Bravata, Antonio M. Bravata, and disgorgement ordered against all defendants.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   March 6, 2014

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 6, 2014.

s/Shawntel Jackson
SHAWNTEL JACKSON